Argued and submitted December 23, 1981, rule held invalid May 11, reconsideration denied July 15, petition for review allowed August 16, 1983 (295 Or 541)
See 297 Or 562, 687 P2d 785 (1984)

PLANNED PARENTHOOD ASSOCIATION, INC. et al,
*Petitioners,*

*v.*

DEPARTMENT OF HUMAN RESOURCES
OF THE STATE OF OREGON,
*Respondent.*

(CA A20856)

663 P2d 1247

Ruth Gundle, Oregon Legal Services Corp., Portland, and Steven S. Walters, American Civil Liberties Union, Portland, argued the cause for petitioners. With them on the briefs were

Donna Meyer, Nancy Helget, Ira Zarov, Andrew R. Gardner, Mary Klepser, Pamela L. Jacklin and Susan P. Graber, Portland.

William F. Gary, Solicitor General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, James E. Mountain, Jr., Deputy Solicitor General, and Virginia L. Linder, Assistant Attorney General, Salem.

Before Buttler, Presiding Judge, and Warden and Warren, Judges.

BUTTLER, P. J.

## BUTTLER, P. J.

Petitioners, individuals and public interest organizations,[1] bring this proceeding pursuant to ORS 183.400[2] to invalidate an administrative rule promulgated by the Department of Human Resources, Adult and Family Services Division (AFSD), that provides state medical assistance for certain "elective" abortions.

The administrative rule, OAR 461-14-052, provides:[3]

"(1)   Payment will not be made for elective abortions performed except under the following conditions:

"(a)   Cases in which a physician, on the basis of his or her professional judgment, has certified in writing that the abortion is necessary because the life of the woman would be endangered if the fetus were carried to term.

"(b)   Cases other than in subsection (a) of this section:

"(A)   Payment may be made for one (1) elective abortion (in addition to an abortion in subsection (a) of this section) if

---

[1] Respondents have made no challenge to petitioners' standing to bring this proceeding.

[2] ORS 183.400 provides, in relevant part:

"(1) The validity of any rule may be determined upon a petition by any person to the Court of Appeals in the manner provided for review of orders in contested cases. The court shall have jurisdiction to review the validity of the rule whether or not the petitioner has first requested the agency to pass upon the validity of the rule in question, but not when the petitioner is a party to an order or a contested case in which the validity of the rule may be determined by a court.

"* * * * *

"(3) Judicial review of a rule shall be limited to an examination of:

"(a) The rule under review;

"(b) The statutory provisions authorizing the rule; and

"(c) Copies of all documents necessary to demonstrate compliance with applicable rulemaking procedures.

"(4) The court shall declare the rule invalid only if it finds that the rule:

"(a) Violates constitutional provisions;

"(b) Exceeds the statutory authority of the agency; or

"(c) Was adopted without compliance with applicable rulemaking procedures.

"* * * * *."

[3] The original petition challenged a version of the rule that allowed medical assistance for abortions in cases of rape and incest. That provision was deleted in July, 1981.

the woman is 18 years of age or older and was receiving maintenance assistance from Oregon at the time determined by a physician that conception occurred. Payment may not be made under this paragraph if payment for an abortion has been made under paragraph (B) of this subsection.

"(B)   Payment may be made for two (2) elective abortions (in addition to an abortion listed in subsection (1)(a) of this rule) if the woman is 17 years of age or younger at the time determined by a physician that conception occurred and is otherwise eligible for medical assistance in Oregon.

"(2)   Payment will not be made for elective abortions unless prior authorized by the Division.

"(3)   Payment for elective abortions will be limited to abortions performed in a physician's office, clinic or outpatient surgery setting unless the physician specifically requests and justifies the need for hospitalization."

Under the statutes governing the medical assistance program, the state is required to provide medical funding, ORS 414.032, to the "categorically needy," defined in ORS 414.025(2),[4]

---

[4] ORS 414.025(2) provided:

"(2) 'Categorically needy' means a person who is a resident of this state and who:

"(a) Is receiving a category of aid.

"(b) Would be eligible for, but is not receiving a category of aid.

"(c) Is in a medical facility and, if he left such facility, would be eligible for a category of aid.

"(d) Is under the age of 21 years and would be a dependent child under the program for aid to dependent children except for age and regular attendance in school or in a course of vocational or technical training.

"(e) Is a caretaker relative named in paragraph (c) of subsection (1) of ORS 418.035 who has in his care a dependent child who would be a dependent child under the program for aid to dependent children except for age and regular attendance in school or in a course of vocational or technical training; or is the spouse of such caretaker relative and fulfills the requirements of subsection (2) of ORS 418.035.

"(f) Is under the age of 21 years, is in a foster family home or licensed childcaring agency or institution under a purchase of care agreement and is one for whom a public agency of this state is assuming financial responsibility, in whole or in part.

"(g) Is a spouse of an individual receiving a category of aid and who is living with the recipient of a category of aid, whose needs and income are taken into account in determining the cash needs of the recipient of a category of aid, and

within the limits of available funds, and to the "medically needy," defined in ORS 414.025(7),[5] within the limits of expressly appropriated and available funds. ORS 414.032.[6]

---

who is determined by the Adult and Family Services Division to be essential to the well-being of the recipient of a category of aid.

"(h) Is a caretaker relative named in paragraph (c) of subsection (1) of ORS 418.035 who has in his care a dependent child receiving aid to dependent children, or a child who would be eligible to receive aid to dependent children except for duration of residence requirement; or is the spouse of such caretaker relative and fulfills the requirements of subsection (2) of ORS 418.035.

"(i) Is under the age of 21 years, is in a youth care center and is one for whom a public agency of this state is assuming financial responsibility, in whole or in part.

"(j) Is under the age of 21 years and is in an intermediate care facility which includes institutions for the mentally retarded; or is under the age of 22 years and is in a psychiatric hospital.

"(k) Is under the age of 21 years and is in an independent living situation with all or part of the maintenance cost paid by Children's Services Division.

"(L) Is a member of a family which received aid to dependent children in at least three of the six months immediately preceding the month in which such family became ineligible for such assistance because of increased hours of or increased income from employment. As long as the member of the family is employed, such families will continue to be eligible for medical assistance for a period of four calendar months beginning with the month in which such family became ineligible for assistance because of increased hours of employment or increased earnings.

"(m) Was receiving Title XIX benefits in the month of December 1973, and for that reason met all conditions of eligibility including financial eligibility for aid to the disabled or blind by criteria for blindness or disability and financial criteria established by the State of Oregon in effect on or before December 1973, had been determined to meet, and for subsequent months met all eligibility requirements.

"(n) Is essential spouse of individuals described in paragraph (m) of this subsection.

"(o) Is an adopted person under 21 years of age for whom a public agency is assuming financial responsibility in whole or in part.

[5] ORS 414.025(7) provided:

"(7) 'Medically needy' means a person who is a resident of this state and who does not have income and resources sufficient to provide himself and his dependents with essential maintenance and medical needs as are necessary to afford a reasonable sustenance compatible with decency and health, and who, except for financial need requirement, would be eligible for a category of aid."

[6] ORS 414.032 provides:

"(1) Within the limits of funds available therefor, medical assistance shall be made available to persons who are categorically needy.

"(2) Within the limits of funds expressly appropriated and available for medical assistance to the medically needy, medical assistance shall be available to persons who are medically needy."

Because this case is an original proceeding in this court for direct review of the validity of the administrative rule in question, we are limited to an examination of that rule. ORS 183.400(3). We do not have the benefit of a record, other than the documentation demonstrating compliance with the applicable rulemaking procedures, which is not challenged here. Neither do we have the benefit of the agency's interpretation of the rule in the context of the agency's other rules, of which the challenged one is a part. OAR 461-14-001 to 461-14-060. Petitioners challenge the constitutionality of the rule on three grounds: (1) it violates an indigent woman's right of privacy under the Oregon Constitution; (2) it violates the Equal Privileges and Immunities Clause of the Oregon Constitution; and (3) it violates the religious freedom guarantees of the Oregon Constitution.

Before considering petitioners' contentions, we must understand the significance and meaning of the rule in the context in which it was adopted, attempting to apply definitions that preexisted the challenged rule. *All* abortions, including those necessary to save the life of the mother, are treated as "elective" under the rule. "Elective" services are defined as "those which are not considered emergency measures, and which can usually be scheduled later or postponed indefinitely without having immediate serious adverse effect on the client's mental or physical health." OAR 461-14-005(9).[7] Elective services must have prior administrative approval, which requires substantiation that the service is "medically indicated" *and* will significantly improve the mental or physical health of the recipient or otherwise reduce health-care costs.[8]

---

[7] OAR 461-14-005(9) provided at the relevant time:

" 'Elective' as used in the context of the Division's policy, 'Elective' means those services for which reimbursement must be prior authorized by the Division. This term applies to those services so identified in the fee schedule(s) and also to other services, although unlisted, which are described by the criteria listed below. 'Elective' is defined as those services which are not considered emergency measures, and which can usually be scheduled later or postponed indefinitely without having immediate serious adverse effect on the client's mental or physical health."

[8] OAR 461-14-005(10) provided at the relevant time:

"(10) Approval of reimbursement for 'Elective' services is contingent upon the request presented including sufficient clinical and other pertinent data to substantiate that provision of the service is medically indicated and will:

There is no definition of the phrase "medically indicated," and we are not certain what it means in the context of abortions, as compared to other elective surgical procedures. For example, if a patient is told by his physician that he has gallstones and that, although there is no immediate need to remove his gallbladder, he should plan on having the surgery performed at his convenience, we assume that the surgery is elective and that it is "medically indicated." That is, there is a medical reason for the procedure and, if providing that surgical procedure meets one of the other requirements of OAR 461-14-005(10) *(see* n 8, *supra),* it will be funded as an elective procedure. In the case of a pregnant woman who is eligible for an abortion under the challenged rule, it is not clear what a physician must determine before he may express the opinion that an abortion is "medically indicated." Of course, he must conclude that the woman is pregnant; however, if the pregnancy is normal in all respects and the mother's health is not endangered, is an abortion "medically indicated" solely because the woman desires to terminate her pregnancy, as she has the right to do? Or must the physician conclude that an abortion is necessary for the physical or mental health of the woman?

Although it is not clear, given the fact that "elective" abortions include those that are necessary because the life of the woman would be endangered if the fetus were carried to term, we conclude that the word "elective" is used in the challenged rule primarily to require authorization prior to performing any surgical procedure that involves an abortion, except in the case of a bona fide medical emergency. OAR 461-14-045(3).[9] We assume that the medical emergency exception applies only to those abortions for which funding is otherwise authorized. All other abortions for which funding is

---

"(a)  Significantly improve the mental or physical health; or

"(b)  Significantly improve the client's ability for self care; or

"(c)  Significantly improve the client's capability for employment; or

"(d)  Significantly reduce the need for longer term, higher cost care."

[9] OAR 461-14-045(3) provided at the relevant time:

"(3)  Procedures identified in the guide as 'Elective,' which are provided in a bonafide medical emergency will be reimbursed without prior authorization. The invoice must be accompanied by validating clinical information, as in 'By Report' (BR). (See Rules 461-13-010, 461-13-041, and 461-14-005(9)."

authorized under the rule are "elective" in the generally understood sense, *e.g.,* they are "medically indicated" if a physician determines that the woman is pregnant and desires an abortion. It would follow as a matter of course that one or more of the four additional conditions of OAR 461-14-005(10) would be met.[10]

The rule, then, provides funding for one or two abortions, depending on the woman's age, for any reason, but for no other surgical procedure involving an abortion, no matter how damaging to the woman's health the failure to provide medical assistance may be, unless the life of the woman would be endangered by failure to provide the assistance. Petitioners' challenge is to the failure to fund any surgical procedure that a physician has determined to be medically necessary, but not life-threatening, if it involves an abortion and the woman's entitlement to the one or two elective abortions has been expended. The parties appear to assume that "medically necessary" means something more than "medically indicated," but less than life-threatening, as applied to abortions. However, because neither the petitioners nor the agency have defined "medically necessary," we will, for the purposes of this opinion, provide our own working definition, recognizing that it is the agency's function to adopt one. We consider an abortion to be medically necessary, generally, when that surgical procedure is required, in a physician's opinion, because specified medical problems may be caused or aggravated by the pregnancy endangering the health of the woman.[11]

---

[10] The meaning of the phrase "medically indicated" in OAR 461-14-005(10), *supra,* n 8), is confusing, at best, unless it is intended to mean that a physical condition exists and will continue to exist or get worse without surgical intervention. The rule appears to say that once that determination has been made, the procedure will be authorized if it is *also* determined that the procedure will "significantly improve the mental or physical health" of the person. In other words, improvement in the health of the person is separate from the procedure's being "medically indicated."

As applied to abortions, the physical condition of pregnancy will continue without intervention, and one of the other determinations, not involving health, necessary to authorize the procedure would seem to follow as a matter of course. That is, termination of pregnancy will either:

"(b) Significantly improve the client's ability for self care; or

"(c) Significantly improve the client's capability for employment; or

"(d) Significantly reduce the need for longer term, higher cost care."

[11] There are many examples of such medical problems in reported cases. In *Doe, et al v. Maher, et al* (Conn Super Ct, Jud Dist of New Haven, No. 19 68 74 (October 9,

Petitioners recognize that under the United States Supreme Court's decision in *Harris v. McRae,* 448 US 297, 100 S Ct 2671, 100 S Ct 2701, 65 L Ed 2d 784 (1980), they are foreclosed from claiming that the rule violates the United States Constitution. However, they contend that the Oregon Constitution should be construed to grant a right of privacy, including the right of women to make procreational choices unfettered by state interference, and that the challenged rule violates the Privileges and Immunities Clause of the Oregon Constitution, Article I, section 20. Before proceeding to petitioners' contentions under the Oregon Constitution, a review of the evolution of the right of privacy under the United States Constitution and the extent to which it protects a woman's right to make procreational choices may be helpful.

In *Griswold v. Connecticut,* 381 US 479, 85 S Ct 1678, 14 L Ed 2d 510 (1965), the Supreme Court held that a statute prohibiting the use of contraceptives violated the Fourteenth Amendment, because it infringed on an area of protected freedom identified as a penumbral right of privacy, implicitly recognized in its previous decisions that "suggest that specific guarantees in the Bill of Rights have penumbras, formed by emanations from those guarantees that help give them life and substance." 381 US at 484. Under the Fourteenth Amendment, the Court concluded that several fundamental constitutional guarantees created a zone of privacy which encompassed "notions of privacy surrounding the marriage relationship." The fundamental federal "right to be free, except in very limited circumstances, from unwanted governmental intrusions into one's privacy," *Stanley v. Georgia,* 394 US 557, 564, 89 S Ct 1243, 22 L Ed 2d 542, 549 (1969), was again recognized in the procreational context in *Eisenstadt v. Baird,* 405 US 438, 92 S Ct 1029, 31 L Ed 2d 349 (1972), which

---

1981)), the court ordered the funding of an abortion under the state's Hyde Amendment rule, because it was medically necessary, although not life-threatening. The plaintiff's doctor stated that it was necessary to perform a cortization (a cutting of the cervix) in order to determine whether plaintiff had cervical cancer, because the indocervical curetage showed dysphlasia (pre-cancerous cells). If an abortion were not performed, there was a risk of hemorrhaging. Other complications could result from continuation of the pregnancy: plaintiff was on methadone, and unless the pregnancy was terminated, there was a risk of cardiac arrest, shock, respiratory and circulatory depression and gastrointestinal problems. *See* n 20, *infra.*

struck down a state law banning the distribution of contraceptives to unmarried persons as denying equal protection under the Fourteenth Amendment.

The following term, the Court decided that the federal right of privacy included the right of a woman to decide whether to terminate her pregnancy by abortion. In *Roe v. Wade,* 410 US 113, 93 S Ct 705, 35 L Ed 2d 147 (1973), the Court stated that the right of privacy was "founded in the Fourteenth Amendment's concept of personal liberty and restrictions on state action" and held that the right was "broad enough to encompass a woman's decision whether or not to terminate her pregnancy." 410 US at 153. However, the Court concluded that the right of procreational choice is not absolute. It reasoned that because a pregnant woman carries an embryo and, later, a fetus, the situation is inherently different from the privacy interests it had recognized previously, *e.g.,* marital intimacy, private possession of obscene material, marriage, procreation or education. The Court concluded that "it is reasonable and appropriate for a state to decide that at some point in time another interest, that of the health of the mother or that of potential life, becomes significantly involved." 410 US at 154. Those interests, the Court said, are separate and distinct, yet increasingly substantial, as a woman approaches term.

In summary, the Court held that a criminal statute that did not take into account the following considerations violated the Due Process Clause of the Fourteenth Amendment:

"(a) For the stage prior to approximately the end of the first trimester, the abortion decision and its effectuation must be left to the medical judgment of the pregnant woman and her attending physician.

"(b) For the stage subsequent to approximately the end of the first trimester, the State, in promoting its interest in the health of the mother, may, if it chooses, regulate the abortion procedure in ways that are reasonably related to maternal health.

"(c) For the stage subsequent to viability, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe, abortion except when

it is necessary, in appropriate medical judgment, for the pres-
ervation of the life and health of the mother." 410 US at
164-65.

After *Roe v. Wade,* the United States Supreme Court
reiterated its conclusion that the Due Process Clause of the
Fourteenth Amendment is the constitutional source of the
federal right of personal privacy and the included right to
decide whether or not to beget or bear a child. *Carey v. Popula-
tion Services International,* 431 US 678, 684-85, 97 S Ct 2010,
52 L Ed 2d 675, 684 (1977). A series of cases followed in which
the Court was asked to decide whether the states were required
to pay for an indigent woman's exercise of her constitutionally
protected right to terminate her pregnancy.

In *Beal v. Doe,* 432 US 438, 97 S Ct 2366, 53 L Ed 2d
464 (1977), the United States Supreme Court held, as a matter
of statutory construction, that Title XIX of the Social
Security Act, 42 USC §§ 1396 *et seq* (1970 ed and Supp V), did
not require states to fund the cost of non-therapeutic abor-
tions when the states were funding medically necessary abor-
tions for financially needy persons as part of their medical pro-
grams. A regulation implementing that policy choice was
found to be rationally related to, and in furtherance of, a
"strong and legitimate interest in encouraging normal child-
birth." 432 US at 446.

Subsequently, the question was presented in *Maher v.
Roe,* 432 US 464, 97 S Ct 2376, 53 L Ed 2d 484 (1977), whether
the Equal Protection Clause of the Federal Constitution
required a state participating in the Medicaid program under
Title XIX to pay for non-therapeutic abortions for needy per-
sons if the state funded childbirth services for them. The Court
held that a state was not required to do so when it had imple-
mented a policy to encourage childbirth by paying for an indi-
gent's childbirth expenses. It reasoned that indigency alone
was not a suspect class for purposes of equal protection analy-
sis and that a regulation funding childbirth services to the
exclusion of non-therapeutic abortion services did not impinge
on the protected privacy interest recognized in *Roe v. Wade,
supra.* The Court said:

"The Connecticut regulation before us is different in kind
from the laws invalidated in our previous abortion decisions.
The Connecticut regulation places no obstacles — absolute or

otherwise — in the pregnant woman's path to an abortion. An indigent woman who desires an abortion suffers no disadvantage as a consequence of Connecticut's decision to fund childbirth; she continues as before to be dependent on private sources for the service she desires. The State may have made childbirth a more attractive alternative, thereby influencing the woman's decision, but it has imposed no restriction on access to abortions that was not already there. The indigency that may make it difficult — and in some cases, perhaps, impossible — for some women to have abortions is neither created nor in any way affected by the Connecticut regulation. We conclude that the Connecticut regulation does not impinge upon the fundamental right recognized in Roe." *Maher v. Roe, supra,* 432 US at 474. (Footnote omitted.)

Because there was no suspect classification or impingement of a fundamental right, the state was not required to demonstrate a compelling interest in its policy of favoring normal childbirth. It was enough that the distinction drawn between childbirth and non-therapeutic abortions by the regulation be rationally related to, and in furtherance of, a legitimate state interest in encouraging normal childbirth — a constitutionally permissible purpose.

*Maher* was followed by *Harris v. McRae, supra,* which raised issues closely analogous to those presented here. In *Harris,* Title XIX of the Social Security Act, 79 Stat 343, as amended, 42 USC § 1396 *et seq,* which excludes federal funding for certain medically necessary abortions in nonlife-threatening situations, were challenged on statutory and constitutional grounds. After concluding that Title XIX does not require states participating in the Medicaid program to pay for those medically necessary abortions for which federal reimbursement was unavailable under the so-called Hyde Amendment, the Court held that the statute did not contravene the First and Fifth Amendments. With regard to the Fifth Amendment challenge to the federal legislation, the Court concluded that the Hyde Amendment did not impinge on the due process liberty recognized in *Wade.* Reiterating what it said in *Maher v. Roe, supra,* the Court found that the Hyde Amendment

"* * * places no governmental obstacle in the path of a woman who chooses to terminate her pregnancy, but rather, by means of unequal subsidization of abortion and other medical services, encourages alternative activity deemed in the public interest. * * *" *Harris v. McRae, supra,* 448 US at 315.

The Court found no constitutionally significant distinction between the restrictions on funding for medically necessary abortions involved in *Harris* and the restrictions on funding for non-therapeutic abortions involved in *Maher:*

"* * * [R]egardless of whether the freedom of a woman to choose to terminate her pregnancy for health reasons lies at the core or the periphery of the due process liberty recognized in *Wade,* it simply does not follow that a woman's freedom of choice carries with it a constitutional entitlement to the financial resources to avail herself of the full range of protected choices. The reason why was explained in *Maher:* although government may not place obstacles in the path of a woman's exercise of her freedom of choice, it need not remove those not of its own creation. Indigency falls in the latter category. The financial constraints that restrict an indigent woman's ability to enjoy the full range of constitutionally protected freedom of choice are the product not of governmental restrictions on access to abortions, but rather of her indigency. Although Congress has opted to subsidize medically necessary services generally, but not certain medically necessary abortions, the fact remains that the Hyde Amendment leaves an indigent woman with at least the same range of choice in deciding whether to obtain a medically necessary abortion as she would have had if Congress had chosen to subsidize no health care costs at all. We are thus not persuaded that the Hyde Amendment impinges on the constitutionally protected freedom of choice recognized in *Wade.*" *Harris v. McRae, supra,* 448 US at 316-17. (Footnotes omitted.)

■   It is apparent from the foregoing summary that the federally protected right of a woman to choose abortion rather than childbirth is a "negative" right: it prohibits a state from obstructing her exercise of that freedom of choice within the limits of *Roe v. Wade, supra,* but does not require affirmative action by the state to remove obstructions that it did not create. It is also clear that under the Equal Protection Clause one choice may be favored over the other, because there is a rational basis for preferring normal childbirth over abortion, a constitutionally permissible purpose.

We had thought that it was clear under *Roe v. Wade, supra,* that a woman's interest in protecting her health was an important aspect of her protected right to choose the termination of her pregnancy, and that even after fetal viability a state may not prohibit abortions "necessary to preserve the life or

health of the mother." 410 US at 164. Given that premise, it is difficult to understand the rational basis for denying one medically necessary surgical procedure to a pregnant woman solely because it involves an abortion while, at the same time, funding all other medically necessary services relating to pregnancy. Be that as it may, *McRae* holds that there is a rational basis for doing so and therefore there is no denial of rights of due process or equal protection under the Fourteenth Amendment.

■        To avoid the result reached in *McRae,* petitioners contend that we should construe the Oregon Constitution to provide a right of privacy that includes a woman's right to choose not to carry her pregnancy to term.[12] They rely on the natural rights declaration of Article I, section 1, and on Article I, sections 3, 9 and 33,[13] collectively, as providing the substan-

---

[12] After *Harris v. McRae, supra,* was decided, some states found a right of privacy in their state constitutions and invalidated state rules analogous to the one challenged here. *See Committee to Defend Reprod. Rights v. Myers,* 29 Cal 3d 252, 172 Cal Rptr 866, 625 P2d 779 (1981); *Moe v. Secretary of Administration,* 382 Mass 629, 417 NE2d 387 (1981); *Right to choose, et al v. Byrne, etc., et al.,* 91 NJ 287, 450 A2d 925 (1982); *cf. Doe, et al v. Maher, et al.,* n 11, *supra.* For an analysis of *Harris* and a discussion of abortion-funding cases generally, *see* Appleton, *Beyond the Limits of Reproductive Choice: The Contributions of the Abortion-Funding Cases to Fundamental-Rights Analysis and to the Welfare-Rights Thesis,* 81 Col L Rev 721 (1981).

[13] Article I, sections 1, 3, 9 and 33 provide:

"Section 1. We declare that all men, when they form a social compact are equal in right: that all power is inherent in the people, and all free governments are founded on their authority, and instituted for their peace, safety, and happiness; and they have at all times a right to alter, reform, or abolish the government in such manner as they may think proper.

"* * * * *

"Section 3. No law shall in any case whatever control the free exercise, and enjoyment of religeous (sic) opinions, or interfere with the rights of conscience.

"* * * * *

"Section 9. No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized.

"* * * * *

"33. This enumeration of rights, and privileges shall not be construed to impair or deny others retained by the people."

Professor (now Justice) Linde commented on section 1:

tial equivalent of the right of privacy found in the Fourteenth Amendment. In doing so, they also rely on the United States Supreme Court cases developing that right, but stop short of the cases explaining its limitations. They argue correctly that we may interpret Oregon's Constitution independently of the federal Constitution's counterparts. If we do that here, unless we conclude that the state constitution provides articulable greater rights, we have not advanced the solution to the problem, and petitioners have not articulated the extent to which the Oregon right is greater.[14]

However, we deem it unnecessary for the purposes of this proceeding to trace an independent right of procreational choice under the Oregon Constitution. We recognize that right, which includes the decision to terminate pregnancy, as an important right protected under the due process guarantee

---

"* * * Section 1, which the draftsman began with 'we declare' means just that; it is a declaration of the ideological premises of the 'social compact', which might possibly be drawn upon in giving historic meaning to other provisions of the constitution, *but which does not furnish an independent source for judicial invalidation of legislative authority."* Linde, *Without Due Process,* 49 Or L Rev 125, at 144 (1970). (Emphasis supplied.)

[14] They do not contend that the right to choose termination of a pregnancy is a basic constitutional right that requires the state to provide an abortion to the indigent as it is required to provide counsel in criminal cases. Neither do they contend that the state must fund all abortions if it funds medical expenses for childbirth.

Notwithstanding those concessions, some of the propositions petitioners assert would necessarily lead to one or the other of those conclusions. For example, petitioners contend that "the state may not condition receipt of benefits upon the waiver of a fundamental right * * *." If we understand the contention correctly, it falls within the accepted principle that unconstitutional conditions may not be imposed on the granting of a right. *See American Communications Ass'n v. Douds,* 339 US 382, 417, 70 S Ct 674, 94 L Ed 925 (1950) (separate opinion of Frankfurter, J.). Petitioners contend that the rule requires an indigent pregnant woman to carry her pregnancy to term, which she has a right not to do, in order to receive pregnancy-related medical benefits. However, by definition, a woman who choses to terminate her pregnancy is not seeking childbirth benefits, and at no time does the state say to a pregnant woman that it will provide childbirth benefits only if she waives her right to choose; those benefits simply follow as a matter of course if the pregnancy is not terminated.

It is true that the effect of the rule is to provide unwanted childbirth expenses for women who are not entitled to a funded abortion under its terms and are unable to obtain an abortion from other sources. In that sense, the rule undoubtedly would have an effect on the woman's choice. On the other hand, if the state provided no funding for either childbirth or abortion, the probable effect would be to encourage early abortions, because, as petitioners contend, they are less expensive and might be affordable. If petitioners' waiver contention is correct, then it must follow that the state is mandated by its constitution to fund all abortions, non-therapeutic as well as medically necessary, if it funds childbirth. As indicated, they disclaim that proposition.

of the Fourteenth Amendment under *Roe v. Wade, supra.* We also recognize that *Harris v. McRae, supra,* decided under the Equal Protection Clause of the federal Constitution, does not foreclose our examining the challenged rule under Article I, section 20, of the Oregon Constitution,[15] which is textually different from its Federal analogue,[16] and has been applied differently by the Oregon Supreme Court:

> "* * * 'The provisions of the state Constitution are the antithesis of the fourteenth amendment in that they prevent the enlargement of the rights of some in discrimination against the rights of others, while the fourteenth amendment prevents the curtailment of rights * * *.' " *State ex rel Reed v. Schwab,* 287 Or 411, 417, 600 P2d 387 (1979), *cert den* 444 US 1088, *reh den* 445 US 955 (1980); *State v. Savage,* 96 Or 53, 59, 184 P 567 (1919), 189 P 427 (1920).

The scope of the two provisions has generally been held to be the same. *City of Klamath Falls v. Winters,* 289 Or 757, 769 n 10, 619 P2d 217 (1980); *Cooper v. OSAA,* 52 Or App 425, 432, 629 P2d 386, *rev den* 291 Or 504 (1981); *see also School Dist. No. 12 v. Wasco County,* 270 Or 622, 628, 529 P2d 386 (1975) (semantic and conceptual differences between the two provisions can be resolved in favor of common underlying principles).

██ Before there may be a problem requiring an analysis under the Equal Privileges and Immunities Clause, there must be a class among which some members are denied a privilege available to other members on equal terms. The state, relying on *State v. Clark,* 291 Or 231, 630 P2d 810, *cert den* 454 US 1084 (1981), contends that the classification created by the rule here does not exist apart from the rule,[17] and hence there

---

[15] Or Const Art I, § 20 provides:

"No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens."

[16] *See State ex rel Oregonian Pub. Co. v. Deiz,* 289 Or 277, 282, 613 P2d 23 (1980); *Tharalson v. State Dept. of Rev.,* 281 Or 9, 15 n 10, 573 P2d 298 (1978); *see also* Linde, *"Without Due Process," supra,* n 13; Linde, *"First Things First: Rediscovering the State Bill of Rights,"* 9 U Balt L Rev 379, 392 (1980).

[17] The state relies on the following language from *State v. Clark, supra:*

"The terms 'class' and 'classification' are invoked sometimes to mean whatever distinction is created by the challenged law itself and sometimes to refer to a law's disparate treatment of persons or groups by virtue of characteristics

is no equal privilege problem cognizable under Article I, section 20. In *Clark*, the Supreme Court held that neither the group of defendants who do not receive preliminary hearings because they are charged by indictment, nor the group of defendants who receive preliminary hearings because they are charged by information, constitutes a "class" for equal protection purposes, because "these defendants do not exist as categories or as classes with distinguishing characteristics before and apart from a prosecutor's decision how to charge one, or some, or all defendants." 291 Or at 243. Here, the group of women qualifying for assistance who seek medically necessary services relating to pregnancy does constitute a class apart from purely administrative action. The members of the class who are denied an equal right to those services are those whose physicians have determined that it is medically necessary to terminate pregnancy for the sake of their health. *Clark* is inapposite.[18] Accordingly, we conclude that there is a class and that petitioners have presented a claim cognizable under the Privileges and Immunities Clause of the Oregon Constitution.[19]

which they have apart from the law in question. Familiar examples of the latter kind of 'class' are personal characteristics such as sex, ethnic background, legitimacy, past or present residency or military service. On the other hand, every law itself can be said to 'classify' what it covers from what it excludes. For instance, the rule of this court that limits the time for filing a petition for review (Rule 10.05) 'classifies' persons by offering the 'privilege' of review to those who file within 30 days and denying it to those who file later. Similarly, a law that licenses opticians and optometrists to perform different functions, *see Williamson v. Lee Optical,* 348 US 483, 75 S Ct 461, 99 L Ed 563 (1955), does not grant or deny privileges to classes of persons whose charactertistics are those of 'opticians' and 'optometrists'; rather, the law creates these classes by the licensing scheme itself. Attacks on such laws as 'class legislation' therefore tend to be circular and, as the above quotations from early decisions show, have generally been rejected whenever the law leaves it open to anyone to bring himself or herself within the favored class on equal terms. *See also Jarvill v. City of Eugene,* 289 Or 157, 184-185, 613 P2d 1 (1980) (sustaining limitations on privilege to use public parking facilities)." 291 Or at 240-41.

[18] The state does not argue that this case can be decided under the principle expressed in *Jarvill v. City of Eugene,* 289 Or 157, 613 P2d 1, *cert den* 449 US 1013 (1980), that no privileges and immunities problem exists where the "disfavored" ones have not chosen to place themselves upon the same terms as the favored group. In *Jarvill,* the Supreme Court stated that persons residing or working in a special downtown development district who were subject to parking restrictions nevertheless enjoyed the privilege of free parking "upon the same terms as all members of the general public: when they * * * [were] not working or residing in the [d]istrict." We do not believe the *Jarvill* analysis is applicable, either. Here, there is one class: indigent pregnant women who desire medically necessary services relating to pregnancy; some of them are granted those services and others are not.

[19] Petitioners also contend that the rule classifies according to wealth. That claim is flawed in that the distinction between poor and rich is created by the financial

■    In contrast to the analysis under the federal Equal Protection Clause, a balancing test is properly employed in analyzing a constitutional claim presented under Article I, section 20, where, as here, important interests are at stake. In that balancing, the detriment to affected members of the class is weighed against the state's ostensible justification for the disparate treatment. *Olsen v. State ex rel Johnson,* 276 Or 9, 20, 554 P2d 139 (1976); *Cooper v. OSAA, supra,* 52 Or App at 425. As we explained in *Cooper,* 52 Or App at 433:

> "Notwithstanding the fact that we have concluded that the impact of the two provisions [*i.e.,* fourteenth amendment Equal Protection Clause and Article I, section 20] is the same in this instance, the Oregon Supreme Court, in analyzing Article I, § 20 claims, has eschewed the federal approach of categorizing an interest as 'fundamental' or 'nonfundamental' and has instead employed a 'balancing test' wherein the court weighs the detriment caused to plaintiff by a particular classification against the state's ostensible justification for the classification. *Olson [sic] v. State ex rel Johnson, supra.* Therefore, although the protection afforded plaintiffs is said to be the same under the Oregon and Federal constitutions, the analytical approach is somewhat different."

In *Olsen,* potential disparity in the quality of educational opportunity was found to be outweighed by the state's interest in promoting local fiscal control of education. In *Cooper,* the disadvantage of a one-year period of ineligibility for OSAA athletics for students transferring to or from private schools was found to be outweighed by the state's "compelling" interest in preventing athletic recruiting among competing schools.

Here, indigent women are denied medical assistance their physicians have determined to be necessary to their physical health, because the prescribed assistance involves an abortion, whereas other indigent pregnant women who seek medically necessary assistance relating to pregnancy that does

---

eligibility criteria for the medical assistance program, not by the rule in question, which applies only to those financially eligible for the medical assistance program. There is a sense in which the challenged rule distinguishes according to wealth: the decision by pregnant women to terminate pregnancy is not affected for women who may be able to afford the procedure. It does not necessarily follow, however, that someone who is not eligible for medical assistance can afford all necessary medical services; that is, the eligibility criteria may in fact establish a line not between the rich and the poor but between the less poor and the poor.

not involve an abortion are granted assistance. The state concedes that the medical assistance program provides funding for all medically necessary services relating to pregnancy and childbirth (within funding limitations), including those necessary to overcome complications attendant on childbirth, so long as they do not involve termination of the pregnancy; therefore, the rule denies benefits for pregnancy-related medically necessary services that involve abortion solely on that ground. The effect of the rule's denial of benefits on the health of the latter group must be weighed against the state's asserted fiscal interest in limiting funding for abortions and in its interest in protecting potential life.

It is apparent, as petitioners contend and the state does not deny, that the challenged rule has an adverse effect on the health of pregnant women who seek medically necessary abortions to avoid additional risk to the mother's health. The rule thus has an adverse effect on the health of some of those eligible for medical assistance, despite the fact that health is the principal interest to be served under the program. *See* ORS 414.025(7), *supra,* n 5; ORS 414.032, *supra,* n 6. Although there is no record as such in this proceeding, other cases in which a record has been made evidence examples of serious physical harm.[20] Moreover, the fact that the challenged rule provides for abortions at the point that continuation of the pregnancy becomes life-threatening presupposes that there will be cases, short of life-threatening situations, in which the health of the pregnant woman will suffer if denied medical assistance involving an abortion. Those situations appear to be covered by the medical emergency rule authorizing an elective service

---

[20] Justice Stevens in his dissenting opinion in *Harris v. McRae, supra,* noted:

"5. The record is replete with examples of serious physical harm. See, e.g., Judge Dooling's opinion in *McRae v. Califano,* 491 F Supp 630, 670 [1980]:

" 'Women, particularly young women, suffering from diabetes are likely to experience high risks of health damage to themselves and their fetuses; the woman may become blind through the worsening during pregnancy of a diabetic retinopathy; in the case, particularly, of the juvenile diabetic, Dr. Eliot testified there is evidence that a series of pregnancies advances the diabetes faster; given an aggravated diabetic condition, other risks increased through pregnancy are kidney problems, and vascular problems of the extremities.' " 65 L Ed 2d at 827.

*See* n 11, *supra.*

without prior authorization if funding for the abortion is otherwise authorized by the challenged rule.

■     We turn to the state's justifications for the rule. It contends that it has a fiscal purpose in restricting the use of state, as opposed to federal, funds for abortion services. Because the effect of the Hyde Amendment is to limit federal funding for abortions, the state argues, and because the state's medical assistance program was designed to qualify for federal revenue sharing, funding of abortions beyond those permitted under the Hyde Amendment necessarily must come out of the state's general fund. Although that is true, petitioners contend that the state has no legitimate, purely fiscal interest in denying medically necessary abortions, because terminating pregnancy is less expensive than childbirth medical expenses and because the long-term expense of bringing a child into a welfare family will be greater. Although the state points out that there is no record to support that contention here, it does not actually dispute the point. We do not believe that the state has shown a state fiscal interest adequate to support the denial of funding for medically necessary abortions.

The state also contends that, in the allocation of funds, it has a substantial interest in providing medical services to protect potential human life and to assure healthy childbirth. We have no doubt that the state does have that interest, but we question whether the challenged rule provides an appropriate balancing of that interest against the mother's health. *Roe v. Wade, supra,* 410 US at 162-65, recognized the state's interest in protecting potential life as a compelling one only in the third trimester at the point of viability of the fetus. As explained in *Harris v. McRae, supra,* 448 US at 313, the Court in *Wade* stated that in the second trimester the interest in protecting the health of the mother was sufficiently substantial to justify regulation reasonably related to that concern. In the first trimester, the state's interest in protecting potential human life was found not to be sufficiently substantial to justify *any* intrusion on the woman's right to terminate her pregnancy. Thus, *Wade* established that the state's interest in protecting potential human life during the first two trimesters is no greater than the mother's interest in protecting

her health. The state is not free, as a matter of federal constitutional law, to challenge that proposition.

■ The challenged rule not only does not make any distinction as to the stage of pregnancy at which a medically necessary abortion is requested, it also does not undertake to protect all potential life, because it authorizes funding for one or two elective abortions, depending on the age of the mother. As such, the rule is too broad and inconsistent to persuade us that it supports the interest in protecting potential life as against the woman's interest in her health. We conclude that the state's interest in protecting potential human life before viability of the fetus, by means of the challenged rule, is of a limited nature and is not sufficient to outweigh the woman's interest in her health.

■ The state argues that, in fashioning a rule, it is entitled to take into account prevalent social mores. In other words, the state claims it is entitled to effect an acceptable compromise on a delicate social issue. Although we accept that proposition, generally, the extent to which such considerations may be accorded weight in the constitutional balancing process under Article I, section 20, is at least questionable. In the context of the challenged rule, the compromise is between not funding medically necessary procedures for pregnant women that involve abortions, and funding all medically necessary services for pregnant women that do not involve abortions. We do not believe that is a compromise that can be made under Article I, section 20, because the weighing of the interests at stake controls.

■ Included among petitioners' equal privileges arguments is the contention that the medical assistance program provides coverage for all "medically necessary" services for men, but, because the challenged rule limits some "medically necessary" services for women, the program denies equal privileges to women. The entire medical assistance program, however, is not before us in this proceeding; the only issue before us is the validity of one challenged rule. In this original proceeding, we do not have a record explaining what the medical assistance program covers and what it does not or its application in practice. It may well be that, if the medical assistance program is a comprehensive one providing all medically necessary services for men but not for women if those services

involve an abortion, the program denies equal privileges to women because they are women. *See Hewitt v. SAIF,* 294 Or 33, 653 P2d 970 (1982). To consider those questions we would need more of a record than we have here. They are not properly before us in this proceeding, and we do not decide them.

Petitioners' final contention is that the challenged rule "impermissibly burdens the free exercise of those whose religious or conscientious convictions counsel consideration of abortion." The limited record before us does not permit our consideration of that contention.

We hold only that the challenged rule, to the extent that it denies funding for medically necessary abortions, is invalid under Article I, section 20 of the Oregon Constitution.

Rule held invalid.