418 S.E.2d 352

Donna J. BOLEY, et al., as Citizens, Taxpayers and Members of the West Virginia Senate; Rodney T. Berry, et al., as Citizens, Taxpayers and Members of the West Virginia House of Delegates, and West Virginians for Life, Inc., a West Virginia Corporation, Plaintiffs Below, Appellees,

v.

Taunja Willis MILLER, Secretary of the West Virginia Department of Health and Human Resources, Defendant Below, Appellant.

No. 20158.

Supreme Court of Appeals of West Virginia.

Submitted March 10, 1992.

Decided May 15, 1992.

---

Victor A. Barone, Hurt & Barone, Charleston, James Bopp, Brames, McCormick, Bopp & Abel, Terra Haute, Ind., for appellees.

Jeffrey K. Matherly, Deputy Atty. Gen., Charleston, for appellant.

MILLER, Justice:

The Secretary of the West Virginia Department of Health and Human Resources (Department) appeals from an order of the Circuit Court of Kanawha County which held that W.Va.Code, 9–4–2 (1983), prohib-

its the use of state Medicaid funds to pay for abortions that do not qualify for federal reimbursement. We find that the circuit court erred, and that W.Va.Code, 9–4–2, does not prohibit these expenditures.

## I.

## FACTS

On October 31, 1990, several members of the West Virginia State Legislature, in both their personal and official capacities, as well as West Virginians for Life, Inc., a nonprofit corporation, filed suit in the Circuit Court of Kanawha County seeking declaratory and injunctive relief. The plaintiffs alleged that W.Va.Code, 9–4–2,[1] prohibits the Department from expending state funds on abortions that do not qualify for federal monies under the "Hyde Amendment."[2] Following discovery, the plaintiffs filed a motion for summary judgment, which was granted by the trial court on March 29, 1991. On April 1, 1991, the Department petitioned this Court for appeal. We granted the petition and stayed execution of the lower court's order pending our consideration of the appeal.

## II.

## THE MEDICAID PROGRAM

In 1965, the United States Congress created the Medicaid program by amending the Social Security Act to include Title XIX. *See generally* 42 U.S.C. 1396, *et seq.* The Medicaid program is a federal/state cooperative program designed to provide medical services for the poor. If a state decides to accept federal funds under Title XIX, it must furnish five types of services[3] for the categorically needy.[4] In interpreting the Medicaid provisions, the United States Supreme Court in *Beal v. Doe*, 432 U.S. 438, 441, 97 S.Ct. 2366, 2369, 53 L.Ed.2d 464, 470 (1977), explained that a state is not required "to provide funding for all medical treatment falling within the five general categories, [but must] establish 'reasonable standards ... which ... are consistent with the objectives of [the Medicaid program].'" (Citation omitted). Funding for the program is based on a formula under which the federal government matches a state's financial contribution at a ratio based on the state's per capita income. 42 C.F.R. § 433.10 (1991).

Each state that chooses to participate in the Medicaid program is required to submit a "state plan" to the federal Health Care Financing Authority (HCFA) for its approval. *See generally* 42 C.F.R. §§ 430.10–430.25. Under its plan, a state must have an accounting system to assure that requests for federal reimbursement comply with federal regulations. 42 C.F.R. 433.32. To receive its matching federal funds, a state is required to file a quarterly report of its Medicaid expenditures with the HCFA. The state then receives matching funds for its expenditures from the federal government. The HCFA audits each

---

**1.** W.Va.Code, 9–4–2, established the Department of Human Services medical services fund. Monies from the fund are used to pay for medical services for the poor. *See* note 7, *infra,* for its relevant provisions.

**2.** This funding restriction, commonly known as the "Hyde Amendment," was so named after its original congressional sponsor, Representative Henry J. Hyde.

The 1991 version of the Hyde Amendment provided: "None of the funds contained in this Act shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term." *See* Department of Labor, Health & Human Services, & Education & Related Agencies Appropriations Act, Pub.L. No. 101–517, § 203, 104 Stat. 2190, 2208 (1991). The 1992 version of the Hyde Amendment is identical. *See* Department

of Labor, Health & Human Services, & Education & Related Agencies Appropriations Act, Pub.L. No. 102–170, § 203, 105 Stat. 1107, 1126 (1992).

**3.** These services include (1) inpatient hospital services; (2) outpatient hospital services; (3) laboratory and x-ray services; (4) skilled nursing services, periodic screening, diagnostic services, and family planning services; and (5) physician's services. *See* 42 U.S.C. § 1396a(a)(10)(A) (1992), and 42 U.S.C. § 1396d(a)(1)–(5).

**4.** The "categorically needy" include needy people with children, the aged, blind, and disabled. 42 U.S.C. § 1396a(a)(10)(A). Title XIX also permits states to extend medical benefits to individuals who are "medically needy." *See* 42 U.S.C. 1396a(a)(10)(C).

state's program quarterly to verify that the state has followed all federal guidelines. 42 C.F.R. § 430.33.

### III.

### THE HYDE AMENDMENT

In 1980, the United States Supreme Court in *Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), addressed whether a state participating in the Medicaid program must continue to fund those abortions that do not qualify for federal monies under the Hyde Amendment. Initially, the Court noted that "[s]ince September 1976, Congress has prohibited ... the use of any federal funds to reimburse the costs of abortions under the Medicaid program except under certain specified circumstances." 448 U.S. at 302, 100 S.Ct. at 2680, 65 L.Ed.2d at 795 (Footnote omitted). In concluding that states are not required to continue funding these services, the Court reasoned:

> "Title XIX was designed as a cooperative program of shared financial responsibility, not as a device for the Federal Government to compel a State to provide services that Congress itself is unwilling to fund. Thus, if Congress chooses to withdraw federal funding for a particular service, a State is not obliged to continue to pay for that service as a condition of continued federal financial support of other services." 448 U.S. at 309, 100 S.Ct. at 2684, 65 L.Ed.2d at 799–800.

Thus, the Court held that: "Title XIX does not require a participating State to pay for those medically necessary abortions for which federal reimbursement is unavailable under the Hyde Amendment." 448 U.S. at 311, 100 S.Ct. at 2685, 65 L.Ed.2d at 800 (Footnote omitted). *See also Williams v. Zbaraz*, 448 U.S. 358, 100 S.Ct. 2694, 65 L.Ed.2d 831 (1980); *Doe v. Heintz*, 204 Conn. 17, 526 A.2d 1318 (1987); *Right to*

*Choose v. Byrne*, 91 N.J. 287, 450 A.2d 925 (1982); *Planned Parenthood Ass'n v. Department of Human Resources*, 63 Or. App. 41, 663 P.2d 1247 (1983), *aff'd*, 297 Or. 562, 687 P.2d 785 (1984). *Cf. Beal v. Doe, supra* (Social Security Act does not require States to fund nontherapeutic abortions as a condition of participating in the Medicaid program).

■ However, the Supreme Court further observed that although states are not compelled to pay for abortions, under the federal Medicaid program "[a] participating State is free, if it so chooses, to include in its Medicaid plan those medically necessary abortions for which federal reimbursement is unavailable." 448 U.S. at 311 n. 16, 100 S.Ct. at 2684 n. 16, 65 L.Ed.2d at 800 n. 16. *Harris* held "only that a State *need* not include such abortions in its Medicaid Plan." 448 U.S. at 311 n. 16, 100 S.Ct. at 2685 n. 16, 65 L.Ed.2d at 800 n. 16 (Emphasis in original). Thus, the Hyde Amendment's restriction on the use of federal Medicaid funds to pay for abortions in certain instances does not prohibit a state from expending its own state funds to pay for abortions. *See, e.g., Beal v. Doe, supra; Preterm, Inc. v. Dukakis*, 591 F.2d 121 (1st Cir.1979), *appeal dismissed, King v. Preterm, Inc.*, 441 U.S. 952, 99 S.Ct. 2182, 60 L.Ed.2d 1057 (1979); *Dodge v. Department of Social Servs.*, 657 P.2d 969 (Colo.App.1982); *Kindley v. Governor of Md.*, 289 Md. 620, 426 A.2d 908 (1981); *Moe v. Secretary of Admin. & Fin.*, 382 Mass. 629, 417 N.E.2d 387 (1981).

In the wake of *Harris v. McRae*, the Department concluded that it was in the best interest of this State to continue funding abortions that are "determined to be medically advisable by the attending physician in light of physical, emotional, psychological, familial, or age factors ... relevant to the well-being of the patient."[5] Be-

---

5. Pursuant to Policy No. MA–85–4, the Department

"makes reimbursement for pregnancy termination when it is determined to be medically advisable by the attending physician in light of physical, emotional, psychological, familial, or age factors (or a combination thereof) relevant to the well-being of the patient.

"Reimbursement is made for pregnancy termination upon the determination of the physician, in consultation with the patient, that the pregnancy termination is medically advisable. In making his/her determination, it is necessary for the physician to discuss the pregnancy termination decision with the patient in

cause the Department believed that the benefit of receiving federal funds for the few eligible abortions was outweighed by the administrative burden of procuring them,[6] it elected not to seek federal funds to pay for these services. Instead, the Department pays for abortions which would otherwise qualify for federal reimbursement with state funds exclusively. To assure that federal appropriations are not misused, the Department deducts the entire amount of expenditures for abortions from the report it submits to the HCFA for federal matching funds. The HCFA has audited the West Virginia State Medicaid Plan for several years and has never questioned the State's procedure.

## IV.

### W.VA.CODE 9-4-2

The plaintiffs concede, as they must under any reading of *Harris v. McRae*, that a state may, if it so chooses, pay with its own funds for medical services that are not eligible for federal reimbursement, including abortions. The plaintiffs argue, however, that under W.Va.Code, 9-4-2, the legislature has chosen not to provide such

funds.[7] Specifically, the plaintiffs argue, and the trial court found, that because W.Va.Code, 9-4-2, requires that state monies be appropriated "consistent with applicable federal laws, rules and regulations," it incorporates the Hyde Amendment as a restriction on the use of state funds. In the alternative, the plaintiffs contend that because state funds are commingled with federal funds before medical bills are paid, federal dollars are illegally being used to provide this service.

■ We begin with the basic proposition that "[i]nterpretations of statutes by bodies charged with their administration are given great weight unless clearly erroneous." Syllabus Point 4, *Security Nat'l Bank & Trust Co. v. First W.Va. Bancorp, Inc.*, 166 W.Va. 775, 277 S.E.2d 613 (1981), *appeal dismissed*, 454 U.S. 1131, 102 S.Ct. 986, 71 L.Ed.2d 284 (1982). However, when the agency's "interpretation is unduly restricted and in conflict with the legislative intent, the agency's interpretation is inapplicable." Syllabus Point 5, in part, *Hodge v. Ginsberg*, 172 W.Va. 17, 303 S.E.2d 245 (1983). Thus, we must first ascertain the legislature's intent when it enacted W.Va.Code, 9-4-2.

light of her age, physical, emotional, psychological, and/or familial circumstances."

6. Federal matching dollars are not available for abortions unless the attending physician certifies in writing that the mother's life would be endangered if the fetus were carried to term. 42 C.F.R. § 441.203.

7. W.Va.Code, 9-4-2, provides, in pertinent part:
"The special fund known as the State of West Virginia public assistance medical services fund ... shall be continued in accordance with the provisions of this section so long as the same may be required by federal laws, rules and regulations applicable to federal-state assistance and thereafter so long as the commissioner shall deem such fund to be otherwise necessary or desirable, and henceforth such special fund shall be known as the department [division] of human services medical services fund, hereinafter referred to as the fund.
"The fund shall consist of payments made into the fund out of state appropriations for medical services to recipients of specified classes of welfare assistance and such federal grant-in-aid as are made available for specified classes of welfare assistance. Any balance in the fund at the end of any fiscal year shall remain in the fund and shall not expire or revert. Payments shall be made out of the fund upon requisition of the commissioner by means of a warrant signed by the auditor and treasurer.
"Recipients of those classes of welfare assistance as are specified by the department, consistent with applicable federal laws, rules and regulations, shall be entitled to have costs of necessary medical services paid out of the fund, in the manner and amounts, to the extent, and for the period determined from time to time to be feasible by the commissioner pursuant to rules, regulations and standards established by him. Such rules, regulations and standards shall comply with requirements of applicable federal laws, rules and regulations and shall be established on the basis of money available for the purpose, the number of recipients, the experience with respect to the incidence of illness, disease, accidents, and other causes among such recipients causing them to require medical services and the costs thereof, the amounts which recipients require otherwise in order to maintain a subsistence compatible with decency and health, and any other factor considered relevant and proper by the commissioner[.]"

■ W.Va.Code, 9–4–2, is just one section in Chapter 9 of the Code, which deals with human services. A cardinal rule of statutory construction compels us to consider any section in the context of the entire statutory scheme to which it relates. As we explained in Syllabus Point 3 of *Smith v. State Workmen's Compensation Commissioner*, 159 W.Va. 108, 219 S.E.2d 361 (1975):

> "Statutes which relate to the same subject matter should be read and applied together so that the Legislature's intention can be gathered from the whole of the enactments."

*See, e.g., Manchin v. Dunfee*, 174 W.Va. 532, 327 S.E.2d 710 (1984); *Clendenin Lumber & Supply Co. v. Carpenter*, 172 W.Va. 375, 305 S.E.2d 332 (1983); *Farley v. Zapata Coal Corp.*, 167 W.Va. 630, 281 S.E.2d 238 (1981); *State ex rel. Callaghan v. West Virginia Civil Serv. Comm'n*, 166 W.Va. 117, 273 S.E.2d 72 (1980).

■ While the phrase "consistent with applicable federal law and regulations," which was the linchpin of the circuit court's holding, is found in W.Va.Code, 9–4–2, this section also uses key definitional terms found in other sections of Chapter 9. The applicable language of W.Va.Code, 9–4–2, is:

> "The fund shall consist of payments made into the fund out of state appropriations for medical services to recipients of specified classes of *welfare assistance* and such federal grant-in-aid as are made available for specified classes of *welfare assistance*....
>
> "Recipients of those classes of *welfare assistance* as are specified by the department, *consistent with applicable federal laws, rules and regulations*, shall be entitled to have costs of necessary medical services paid out of the fund[.]" (Emphasis added).[8]

The legislature defined "welfare assistance" in W.Va.Code, 9–1–2(f) (1972), as "the three classes of assistance administered by the department [division], namely: Federal-state assistance, federal assistance and state assistance." These three forms of assistance are also defined in W.Va. Code, 9–1–2. "Federal-state assistance" arises under the various shared-expense cooperative programs authorized by the United States Congress and specifically includes the Medicaid program found in "subchapter ... nineteen, chapter seven, Title 42, United States Code[.]" W.Va.Code, 9–1–2(c). "Federal assistance" includes "pass-through" programs in which the State merely acts as the distributor and "the cost of which is paid entirely out of federal appropriations." W.Va.Code, 9–1–2(d). "State assistance" is defined to "mean and include all forms of aid, care, assistance, services and general relief made possible solely out of state, county and private appropriations to or on behalf of indigent persons, which are authorized by, and who are authorized to receive the same under and by virtue of, department rules and regulations." W.Va.Code, 9–1–2(e).

Thus, when the legislature stated in W.Va.Code, 9–4–2, that "[r]ecipients of those classes of welfare assistance ... shall be entitled to have costs of necessary medical services paid out of the fund," it must have recognized that the fund administers more than one type of assistance. In other words, the legislature clearly understood that the fund would operate programs with different purposes and funding under the three categories outlined above. Accordingly, we find that the Department's interpretation of W.Va.Code, 9–4–2, is in harmony with the legislature's intent when it enacted this provision.

■ As earlier noted, the Department utilizes state funds entirely to pay for abortion services and does not use federal dollars for abortion-related expenses. Even though disbursements are made from the fund after federal matching funds are received, by using the most basic accounting procedures, the Department knows how much of the budget is state money and how much is federal. As long as expenditures for abortions are not included in the request for federal matching funds, there is

---

**8.** For additional text of W.Va.Code, 9–4–2, see note 7, *supra*.

no possibility that federal funds are being misappropriated. Consequently, the lower court's finding that federal funds are being used to subsidize abortions in this State is erroneous.

Plaintiffs also assert that W.Va.Code, 9–4–2, compels the State to comply with the Hyde Amendment because it mandates that welfare assistance be distributed "consistent with applicable federal laws, rules and regulations." While we agree with the plaintiffs that the Hyde Amendment is federal law, so also is the United States Supreme Court's interpretation of this provision in *Harris v. McRae.* Under *Harris,* West Virginia may choose to use its own revenues to fund abortions or not to fund abortions. Moreover, the same language that the plaintiffs cite is found in the 1972 version of W.Va.Code, 9–4–2, which was enacted four years before the first Hyde Amendment was passed. We find it hard to conceive that our legislature incorporated a future federal legislative provision into W.Va.Code, 9–4–2, especially where the legislature couched its language in such general terms.

Finally, we refuse to adopt a tortured construction of W.Va.Code, 9–4–2, where that construction has far-reaching implications on whether other medical procedures could be covered under our state Medicaid program. Although the plaintiffs would like to frame the outcome of this case as affecting only poor women and their right to reproductive privacy, the reasoning of the trial court's order has a much broader impact. In essence, the court's order would prohibit the State of West Virginia from spending state funds for any medical services not authorized for federal reimbursement.

There are numerous federal regulations that proscribe the use of federal funds for certain medical services. For example, federal funding is not available under the Medicaid program where the patient is in a public institution,[9] or is over twenty-one but under sixty-five and is in a mental institution. *See* 42 C.F.R. § 441.13. Likewise, federal funding is unavailable for certain categories of sterilization. *See generally* 42 C.F.R. §§ 441.253–441.255. Finally, certain services offered with organ transplants are not eligible for federal reimbursement. *See* 42 C.F.R. § 441.13. Thus, if we were to accept the plaintiffs' interpretation of W.Va.Code, 9–4–2, the State of West Virginia would be prohibited from using state tax dollars to provide services it may deem necessary for its impoverished citizens. We cannot imagine that the legislature intended such a result, especially when it included in the definition of "welfare assistance" programs that are funded by the state alone.[10]

Not only do we believe that the legislature did not intend the result urged by the plaintiffs, but to reach that conclusion we would have to ignore the very foundation of the Medicaid program. As aptly stated by the United States Supreme Court: "The cornerstone of Medicaid is financial contribution by both the Federal Government and the participating State." *Harris v. McRae,* 448 U.S. at 308, 100 S.Ct. at 2684, 65 L.Ed.2d at 799. The linchpin of a federal-state cooperative program is that it is *cooperative.* Obligations are assumed by the state voluntarily. If a state chooses not to handle a particular category of medical service according to federal regulations, it may do so. The state simply forgoes the opportunity to have the federal government share the cost of that particular service. Federal reimbursement is a carrot, not a bullwhip.

For these reasons, we hold that W.Va. Code, 9–4–2, does not prohibit the use of

---

**9.** A "public institution" is "an institution that is the responsibility of a governmental unit or over which a governmental unit exercises administrative control." 42 C.F.R. § 435.1009.

**10.** For the last three years, the legislature has attempted to restrict the use of state monies to pay for abortions by inserting prohibitory language in the budget bill. We have stated in a number of cases that the budget bill cannot be used to adopt or change unrelated substantive statutes. *See, e.g., Benedict v. Polan,* 186 W.Va. 452, 413 S.E.2d 107 (1991); *Dadisman v. Moore,* 181 W.Va. 779, 384 S.E.2d 816 (1988). *See also Jones v. Rockefeller,* 172 W.Va. 30, 303 S.E.2d 668 (1983); *DeVault v. Nicholson,* 170 W.Va. 719, 296 S.E.2d 682 (1982).

state Medicaid funds to pay for abortions that do not qualify for federal reimbursement under the Hyde Amendment.

## V.

## CONCLUSION

Accordingly, the judgment of the Circuit Court of Kanawha County is therefore reversed.

Reversed.