STATE of Alaska, DEPARTMENT OF HEALTH & SOCIAL SERVICES, Karen Perdue, Commissioner, Appellant,

v.

PLANNED PARENTHOOD OF ALASKA, INC., Jan Whitefield, M.D., and Susan Lemagie, M.D., Appellees.

No. S–9109.

Supreme Court of Alaska.

July 27, 2001.

Lisa M. Kirsch, Assistant Attorney General, and Bruce M. Botelho, Attorney General, Juneau, for Appellant.

Christine Schleuss, Suddock & Schleuss, Cooperating Counsel to the Alaska Civil Liberties Union, Anchorage, and Louise Melling, Jody Yetzer, Talcott Camp, and Jennifer Dalven, ACLU Foundation, Reproductive Freedom Project, New York, NY, for Appellees.

Kevin G. Clarkson, Brena, Bell & Clarkson, P.C., Anchorage, for Amicus Curiae The Alaska State Legislature.

Jeffrey D. Troutt, Juneau, and Paul Benjamin Linton, Northbrook, IL, for Amicus Curiae United Families International.

Susan Orlansky, Feldman & Orlansky, Anchorage, Karen E. Katzman, Sheila S. Boston, and Dina L. Bakst, Kaye Scholer Fierman Hays & Handler, LLP, and Martha F. Davis and Yolanda S. Wu, NOW Legal Defense and Education Fund, New York, NY, for Amicus Curiae NOW Legal Defense and Education Fund.

Before FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

## OPINION

FABE, Chief Justice.

### I. *INTRODUCTION*

Alaska's Medicaid program funds virtually all necessary medical services for poor Alaskans—"regardless of race, age, national origin, or economic standing"[1]—but it denies funding for medically necessary abortions. Alone among Medicaid-eligible Alaskans, women whose health is endangered by pregnancy are denied health care based solely on political disapproval of the medically necessary procedure. This selective denial of medical benefits violates Alaska's constitutional guarantee of equal protection. Our conclusion is supported by the majority of jurisdictions that have considered comparable restrictions on state funding of medically necessary abortions: these state courts have concluded that, under their state constitutions, government health care programs that fund other medically necessary procedures may not deny assistance to eligible women whose health depends on obtaining abortions.[2]

This case concerns the State's denial of public assistance to eligible women whose health is in danger. It does not concern State payment for elective abortions; nor

---

1. AS 47.07.010.

2. *See Committee to Defend Reprod. Rights v. Myers,* 29 Cal.3d 252, 172 Cal.Rptr. 866, 625 P.2d 779 (1981); *Moe v. Secretary of Admin. & Fin.,* 382 Mass. 629, 417 N.E.2d 387 (1981); *Women of Minnesota v. Gomez,* 542 N.W.2d 17

does it concern philosophical questions about abortion which we, as a court of law, cannot aspire to answer. We join the California Supreme Court in clarifying that "this case does not turn on the morality or immorality of abortion, and most decidedly does not concern the personal views of the individual justices as to the wisdom of the legislation itself or the ethical considerations involved in a woman's individual decision whether or not to bear a child."[3] Indeed, as the California Supreme Court emphasized, "similar constitutional issues would arise if the Legislature ... funded [Medicaid] abortions but refused to provide comparable medical care for poor women who choose childbirth."[4] The constitutional issue in this case therefore "does not involve a weighing of the value of abortion as against childbirth, but instead concerns the protection of either procreative choice from discriminatory governmental treatment."[5] As the California court recognized, the issue presented is "not whether the state is generally obligated to subsidize the exercise of constitutional rights for those who cannot otherwise afford to do so."[6] Rather, the

issue is whether the State, having enacted a benefits program, may discriminate between recipients in the manner attempted by the Department of Health and Social Services (DHSS) today. We hold that it may not. Once the State undertakes to fund medically necessary services for poor Alaskans, it may not selectively exclude from that program women who medically require abortions.

Although the State argues that courts may not enjoin unconstitutional use of the legislative appropriations power, this proposition is unsupported by case law from any jurisdiction. The legislature's spending power does not create license to disregard citizens' constitutional rights. In rejecting this part of the State's argument, we concur with every state and federal court that has considered this issue.

## II. FACTS AND PROCEEDINGS

Alaska provides medical services for poor Alaskans primarily through the Medicaid program.[7] Medicaid is a comprehensive health care program designed to provide medical assistance for all eligible poor per-

---

(Minn.1995); *Right to Choose v. Byrne*, 91 N.J. 287, 450 A.2d 925 (1982); *New Mexico Right to Choose/NARAL v. Johnson*, 126 N.M. 788, 975 P.2d 841 (1998), *cert. denied*, 526 U.S. 1020, 119 S.Ct. 1256, 143 L.Ed.2d 352 (1999); *Women's Health Ctr. of W. Va., Inc. v. Panepinto*, 191 W.Va. 436, 446 S.E.2d 658 (1993); *but see Renee B. v. State, Agency for Health Care Admin.*, 790 So.2d 1036 (Fla.2001); *Doe v. Department of Soc. Servs.*, 439 Mich. 650, 487 N.W.2d 166 (1992); *Rosie J. v. North Carolina Dep't of Human Resources*, 347 N.C. 247, 491 S.E.2d 535 (1997); *Hope v. Perales*, 83 N.Y.2d 563, 611 N.Y.S.2d 811, 634 N.E.2d 183 (1994); *Fischer v. Department of Pub. Welfare*, 509 Pa. 293, 502 A.2d 114 (1985).

A number of lower state courts have also found that funding restrictions similar to those challenged today violated their state constitutions. *See Simat Corp. v. Arizona Cost Containment System Admin.*, No. CV1999014614 (Ariz.Super. May 23, 2000); *Doe v. Maher*, 40 Conn.Supp. 394, 515 A.2d 134 (1986); *Roe v. Harris*, NO. 96977 (Idaho Dist. Feb. 1, 1994); *Doe v. Wright*, No. 91–CH–1958 (Ill.Cir. Dec. 2, 1994); *Clinic for Women v. Humphreys*, No. 49D12–9908–MI–1137 (Ind.Super. Oct. 18, 2000); *Jeannette R. v. Ellery*, No. BDV–94–811 (Mont.Dist. May 19, 1995); *Planned Parenthood Ass'n v. Department of Human Resources of Oregon*, 63 Or.App. 41, 663 P.2d 1247 (1983), *aff'd on other grounds*, 297 Or. 562, 687 P.2d 785 (1984) (declining to reach constitutional issue); *Low–Income Women of Tex-*

*as v. Bost*, 38 S.W.3d 689 (Tex.App.2000); *Doe v. Celani*, No. S81–84CnC (Vt.Super. May 23, 1986); *but see Doe v. Childers*, No. 94CI02183 (Ky.Cir. Aug. 7, 1995).

**3.** *Myers*, 172 Cal.Rptr. 866, 625 P.2d at 780.

**4.** *Id.*

**5.** *Id.*

**6.** *Id.*

**7.** *See* AS 47.07; *see also* 42 U.S.C. §§ 1396–1396v (1997).

A second program, Chronic and Acute Medical Assistance (CAMA) complements Medicaid by providing some medical care for Alaskans who are poor but ineligible for Medicaid. *See* AS 47.08.150. CAMA's predecessor, the General Relief Medical program (GRM), funded abortions for eligible women when the procedure was necessary to protect their health or when pregnancy resulted from sexual assault, sexual abuse of a minor, or incest. *See* 7 AAC 47.200(a)(4)(F) (2000); 7 AAC 47.290(8) (2000). In 1998, after nearly 30 years of government support for medically necessary abortions through GRM, the legislature stopped funding the program and enacted CAMA as a replacement. CAMA covers essentially the same services as GRM, except that it does not fund any

sons in the state.[8] But a DHSS regulation, 7 Alaska Administrative Code (AAC) 43.140, imposes a limit on the state's health care funding: It denies Medicaid assistance for medically necessary abortions unless a pregnant woman is at risk of dying or her pregnancy resulted from rape or incest.[9] Because DHSS offers no other funding source for abortions, 7 AAC 43.140 ensures that a woman who medically requires an abortion will receive no assistance from the state.

The range of women whose access to medical care is restricted by the regulation is broad. According to medical evidence provided to the superior court, some women—particularly those who suffer from pre-existing health problems—face significant risks if they cannot obtain abortions. Women with diabetes risk kidney failure, blindness, and preeclampsia or eclampsia—conditions characterized by simultaneous convulsions and comas—when their disease is complicated by pregnancy. Women with renal disease may lose a kidney and face a lifetime of dialysis if they cannot obtain an abortion. And pregnancy in women with sickle cell anemia can accelerate the disease, leading to pneumonia, kidney infections, congestive heart failure, and pulmonary conditions such as embolus. Poor women who suffer from conditions such as epilepsy or bipolar disorder face a particularly brutal dilemma as a result of DHSS's regulation—medication needed by the women to control their own seizures or other symp-

toms can be highly dangerous to a developing fetus. Without funding for medically necessary abortions, pregnant women with these conditions must choose either to seriously endanger their own health by forgoing medication, or to ensure their own safety but endanger the developing fetus by continuing medication. Finally, without state funding, Medicaid-eligible women may reach an advanced stage of pregnancy before they can gather enough money for an abortion; resulting late-term abortions pose far greater health risks than earlier procedures.

In June 1998 the plaintiffs—two medical doctors and Planned Parenthood of Alaska—filed a complaint against DHSS. They sought to enjoin enforcement of 7 AAC 43.140 and also sought a judgment declaring that the State's denial of funding for medically necessary abortions violates Alaska's Constitution. Superior Court Judge Sen K. Tan granted summary judgment in favor of Planned Parenthood. Based on this court's holding that "reproductive rights are fundamental ... [and] include the right to an abortion,"[10] the superior court concluded that 7 AAC 43.140 impermissibly interferes with Medicaid-eligible women's constitutional rights to privacy. Because the State failed to articulate a compelling state interest for this interference, the superior court permanently enjoined DHSS from enforcing the regulation "so as to deny coverage for medically necessary abortions." The State now appeals.[11]

---

abortions. *Compare* AS 47.08.150 *with* 7 AAC 47.200.

**8.** *See* AS 47.07.010. Medicaid relies on joint state-federal funding, with the federal government paying a portion of the state's costs. *See* 42 U.S.C. §§ 1396b(a), 1396d(b). The "Hyde Amendment" limits federal Medicaid contributions for abortions: Federal funding is available for abortions in cases of rape or incest or where the woman's life is in danger, but not for abortions necessary to protect a woman's health. *See* Pub.L. No. 106–554, §§ 508–509, 114 Stat. 2763 (2000); *Right to Choose v. Byrne*, 91 N.J. 287, 450 A.2d 925, 928–29 (1982) (discussing history of Hyde Amendment).

**9.** 7 AAC 43.140 (2000) provides in part:
   (a) Payment for an abortion will, in the department's discretion, be covered under Medicaid if the physician services invoice is accompanied by certification that the
   (1) life of the mother would be endangered if the pregnancy were carried to term; or

   (2) pregnancy is the result of an act of rape or incest.

**10.** *Valley Hosp. Ass'n v. Mat–Su Coalition for Choice*, 948 P.2d 963, 969 (Alaska 1997).

**11.** For part of the time that this appeal was pending, DHSS continued to withhold funding for medically necessary abortions, despite the superior court's injunction. On Planned Parenthood's motion, the superior court held a show cause hearing to determine whether the Department was in contempt of court. The court heard DHSS's claim that funding was unavailable, and determined, after a "struggle", not to hold the agency in contempt. However, the court issued a new injunction to reiterate the terms of the first injunction and explicitly direct that, while DHSS retained discretion over its use of resources, it should consider state Medicaid funds available to pay for medically necessary abortions. The parties on appeal presented records from these proceedings and additional related briefing.

## III. STANDARD OF REVIEW

■ We review a grant of summary judgment de novo, exercising our independent judgment to "determine whether the parties genuinely dispute any material facts and, if not, whether the undisputed facts entitle the moving party to judgment as a matter of law." [12] On questions of constitutional law, we also apply our independent judgment.[13] We may affirm the superior court on any ground supported by the record.[14]

## IV. DISCUSSION

### A. The Challenged Regulation Violates Equal Protection.

■ By providing health care to all poor Alaskans except women who need abortions, the challenged regulation violates the state constitutional guarantee of "equal rights, opportunities, and protection under the law." [15] The State, having established a health care program for the poor, may not selectively deny necessary care to eligible women merely because the threat to their health arises from pregnancy. Because we decide this case on state constitutional equal protection grounds, we do not review the superior court's privacy-based ruling. We do note, however, that our analysis today closely parallels that applied by many of the fifteen courts that have rejected similar restrictions.[16] Although other courts' decisions have rested on a variety of state constitutional provisions, including equal protection,[17] constitutional equal-rights-for-women clauses,[18] due process,[19] and privacy,[20] the underlying logic has been the same in decision after decision: "[W]hen state government seeks to act for the common benefit, protection, and security of the people in providing medical care for the poor, it has an obligation to do so in a neutral manner so as not to infringe upon the constitutional rights of our citizens." [21] As the Massachusetts Supreme Judicial Court observed, the constitutional principle at issue is straightforward: "It is elementary that 'when a State decides to alleviate some of the hardships of poverty by

---

12. *M.C. v. Northern Ins. Co. of N.Y.*, 1 P.3d 673, 674–75 (Alaska 2000).

13. *See Rollins v. State, Dep't of Revenue, Alcoholic Beverage Control Bd.*, 991 P.2d 202, 206 (Alaska 1999).

14. *See James v. McCombs*, 936 P.2d 520, 523 n. 2 (Alaska 1997); *see also Dixon v. Dixon*, 747 P.2d 1169, 1175 n. 5 (Alaska 1987).

15. Alaska Const. art. I, § 1.

16. *See supra* note 2.

17. *See, e.g., Doe v. Maher*, 40 Conn.Supp. 394, 515 A.2d 134, 157–59 (1986); *Right to Choose v. Byrne*, 91 N.J. 287, 450 A.2d 925, 934–37 (1982); *Planned Parenthood Ass'n v. Department of Human Resources of Oregon*, 63 Or.App. 41, 663 P.2d 1247, 1257–61 (1983), *aff'd on other grounds*, 297 Or. 562, 687 P.2d 785 (1984); *see also Committee to Defend Reprod. Rights v. Myers*, 29 Cal.3d 252, 172 Cal.Rptr. 866, 625 P.2d 779 (1981).

18. *See, e.g., New Mexico Right to Choose/NARAL v. Johnson*, 126 N.M. 788, 975 P.2d 841, 850–57 (1998); *Doe v. Maher*, 515 A.2d at 159–62.

19. *See, e.g., Moe v. Secretary of Admin. & Fin.*, 382 Mass. 629, 417 N.E.2d 387, 398–99 (1981); *Doe v. Maher*, 515 A.2d at 146–57.

20. *See, e.g., Women of Minnesota v. Gomez*, 542 N.W.2d 17, 26–32 (Minn.1995); *Women's Health Ctr. of W. Va., Inc. v. Panepinto*, 191 W.Va. 436, 446 S.E.2d 658, 664–66 (1993).

21. *Panepinto*, 446 S.E.2d at 667; *see also Myers*, 172 Cal.Rptr. 866, 625 P.2d at 781 (addressing the narrow question "whether the state, having enacted a general program to provide medical services to the poor, may selectively withhold such benefits from otherwise qualified persons because such persons seek to exercise their constitutional right of procreative choice in a manner which the state does not favor and does not wish to support" and holding that it may not); *Gomez*, 542 N.W.2d at 28 (defining the "relevant inquiry" as "whether, having elected to participate in a medical assistance program, the state may selectively exclude from such benefits otherwise eligible persons solely because they make constitutionally protected health care decisions with which the state disagrees," and concluding that the state may not); *Byrne*, 450 A.2d at 937 ("[W]e hold that the State may not jeopardize the health and privacy of poor women by excluding medically necessary abortions from a system providing all other medically necessary care for the indigent."); *Johnson*, 975 P.2d at 856 ("[C]ourts very rarely require the government to fund its citizens' exercise of their constitutional rights.... But that is not to say that when the Department elects to provide medically necessary services to indigent persons, it can do so in a way that discriminates against some recipients on account of their gender.").

providing medical care, the manner in which it dispenses benefits is subject to constitutional limitations.' "[22] The State's spending discretion is limited by the constitution—"[w]hile the State retains wide latitude to decide the manner in which it will allocate benefits, it may not use criteria which discriminatorily burden the exercise of a fundamental right."[23]

▪ Alaska's constitutional equal protection clause mandates "equal treatment of those similarly situated;"[24] it protects Alaskans' right to non-discriminatory treatment more robustly than does the federal equal protection clause.[25] In analyzing a challenged law under Alaska's equal protection provision, we first determine what level of scrutiny to apply, using Alaska's "sliding scale" standard.[26] The "weight [that] should be afforded the constitutional interest impaired by the challenged enactment" is "the most important variable in fixing the appropriate level of review."[27] Second, we examine the State's interests served by the challenged regulation.[28] If the burden placed on constitutional rights by the regulation is minimal, then the State need only show that its objectives were legitimate for the regulation to survive an equal protection challenge.[29] But if "the objective degree to which the challenged legislation tends to deter [exercise of constitutional rights]"[30] is significant, the regulation cannot survive constitutional challenge unless it serves a compelling state interest.[31] Finally, if the State shows that its

interests justify burdening the rights of citizens, for the regulation to survive constitutional challenge the State must demonstrate that the means it has chosen to advance those goals are well-fitted to the ends, and that its goals could not be accomplished by less restrictive means.[32]

▪ The regulation at issue in this case affects the exercise of a constitutional right, the right to reproductive freedom.[33] Therefore, the regulation is subject to the most searching judicial scrutiny, often called "strict scrutiny."[34] We have explained in the past that such scrutiny is appropriate where a challenged enactment affects "fundamental rights," including "the exercise of intimate personal choices."[35] This court has specified that the right to reproductive freedom "may be legally constrained only when the constraints are justified by a compelling state interest, and no less restrictive means could advance that interest."[36]

Judicial scrutiny of state action is equally strict where the government, by selectively denying a benefit to those who exercise a constitutional right, effectively deters the exercise of that right. In *Alaska Pacific Assurance Co. v. Brown,* we held the State to a "very high" burden to justify a statute that reduced workers' compensation benefits paid to workers who exercised their constitutional right to leave the state.[37] We concluded that the challenged regulation did not meet this high standard and thus violated equal protection.[38] Like the regulation at issue today,

---

**22.** *Moe,* 417 N.E.2d at 401 (quoting *Maher v. Roe,* 432 U.S. 464, 469–70, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977)).

**23.** *Id.*

**24.** *Alaska Pacific Assurance Co. v. Brown,* 687 P.2d 264, 271 (Alaska 1984).

**25.** *See State v. Anthony,* 810 P.2d 155, 157 (Alaska 1991).

**26.** *See Matanuska–Susitna Borough Sch. Dist. v. State,* 931 P.2d 391, 396 (Alaska 1997).

**27.** *Id.* (quoting *Alaska Pacific Assurance Co.,* 687 P.2d at 269).

**28.** *See id.; State v. Ostrosky,* 667 P.2d 1184, 1192 (Alaska 1983).

**29.** *See id.*

**30.** *Alaska Pacific Assurance Co.,* 687 P.2d at 271.

**31.** *See Matanuska–Susitna Borough Sch. Dist.,* 931 P.2d at 396 (quoting *Alaska Pacific Assurance Co.,* 687 P.2d at 269–70).

**32.** *See id.* at 396–97.

**33.** *See Valley Hosp. Ass'n v. Mat–Su Coalition for Choice,* 948 P.2d 963, 968–69 (Alaska 1997).

**34.** *See State v. Ostrosky,* 667 P.2d 1184, 1192 (Alaska 1983).

**35.** *Id.*

**36.** *Valley Hosp.,* 948 P.2d at 969.

**37.** 687 P.2d at 273–74.

**38.** *See id.* We have since applied more relaxed scrutiny where "[t]he infringement on [the] right to travel is relatively small and would not be likely to deter a person from traveling." *Church*

the challenged statute in *Alaska Pacific Assurance Co.* did not forbid individual exercise of constitutional rights; rather, it limited the government benefits distributed to the class of individuals who exercised that right.[39] As we explained in that case, we look to the real-world effects of government action to determine the appropriate level of equal protection scrutiny: "The suspicion with which this court will view infringements upon [constitutional rights] depends upon ... the objective degree to which the challenged legislation tends to deter [the exercise of those rights]."[40]

We reached a similar conclusion in *Alaska Gay Coalition v. Sullivan,* holding that the Municipality of Anchorage could not constitutionally withhold a public benefit based on a potential recipient's beliefs and public expression.[41] The municipality had undertaken to publish a guidebook to public and private organizations in Anchorage, but excluded the Alaska Gay Coalition from the book.[42] We held that this exclusion violated the Coalition's constitutional rights to equal protection under the law.[43] We explained:

> When the Municipality decided to publish a limited informational guide to public and private local resources, it did not thereby assume the obligation of providing space to every possible group.... Had the Municipality deleted groups at random or used criteria not related to the nature of the particular organizations, constitutional violations may not have resulted. In deleting the Alaska Gay Coalition ... however, appellees denied that group access to a public forum based solely on the nature of its beliefs. In so doing, they violated appellant's constitutional rights to ... equal protection under the law.[44]

Similarly, in the instant case, the State's obligations do not depend on whether the State has undertaken to provide limitless health care services to all poor Alaskans. Rather, DHSS is constitutionally bound to apply neutral criteria in allocating health care benefits, even if considerations of expense, medical feasibility, or the necessity of particular services otherwise limit the health care it provides to poor Alaskans.

The State argues in this case that it does not provide all necessary medical care to indigent Alaskans. For support, it cites 7 AAC 43.385, a regulation that excludes from Medicaid coverage such services as medically unnecessary inpatient treatment,[45] beautifying cosmetic surgery,[46] and transplants of organs other than kidney, cornea, skin, and bone marrow.[47] This regulation has not been challenged, and the issue has not been thoroughly briefed by the parties, but the restrictions appear to relate to medical necessity, cost, and feasibility—all politically neutral criteria. Such spending limits are irrelevant to the constitutional issue raised by the State's denial of coverage for medically necessary abortions. As the United States Supreme Court noted in *Shapiro v. Thompson:*

> We recognize that the State has a valid interest in preserving the fiscal integrity of its programs. It may legitimately attempt to limit its expenditures, whether for public assistance, public education, or any other program. But a State may not accomplish such a purpose by invidious distinctions between classes of its citizens.[48]

Like *Alaska Pacific Assurance Co., Alaska Gay Coalition* establishes that under Alaska's equal protection provision the govern-

---

[*v. State, Dep't of Revenue,* 973 P.2d 1125, 1131 (Alaska 1999). In this case the likelihood of deterring exercise of the right is very high: The State's own statistics and the findings of the superior court indicate that, under the challenged regulation, some women "will have no choice but to go forward with the pregnancy." We therefore follow *Alaska Pacific Assurance Co.* in applying strict scrutiny.]

39.  *See* 687 P.2d at 266–67.

40.  *Id.* at 271.

41.  578 P.2d 951, 960 (Alaska 1978).

42.  *Id.*

43.  *Id.*

44.  *Id.*

45.  7 AAC 43.385(2), (6), (9), (11) & (12).

46.  7 AAC 43.385(4).

47.  7 AAC 43.385(17).

48.  394 U.S. 618, 633, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969).

ment may not allocate state benefits so as to deter citizens' exercise of constitutional rights.

In this case, it is undisputed that 7 AAC 43.140 deters women from obtaining abortions. The State itself stated that eliminating public assistance for medically necessary abortions would cause about thirty-five percent of women who would otherwise have obtained abortions to instead carry their pregnancies to term, despite the associated threat to their health. Under *Alaska Pacific Assurance Co.*, such a restriction warrants the highest degree of judicial scrutiny.

In the seminal *Shapiro v. Thompson* decision, the United States Supreme Court also strictly scrutinized—and ultimately held unconstitutional—state programs that denied benefits to citizens based on their exercise of constitutional rights.[49] *Shapiro* invalidated state laws that denied welfare benefits to persons who had moved into the jurisdiction within the past year.[50] The Court found that "the prohibition of benefits ... creates a classification which constitutes an invidious discrimination denying [new residents] equal protection of the laws."[51] The Court held that states could not constitutionally tailor their benefits programs to deter immigration from other states: "If a law has no other

purpose ... than to chill the assertion of constitutional rights by penalizing those who choose to exercise them, then it [is] patently unconstitutional."[52]

■ Although *Shapiro* and *Alaska Pacific Assurance Co.* applied strict scrutiny to reject restrictions like the one at issue in this case, 7 AAC 43.140 would fail equal protection analysis under any standard. Under the regulation, the State grants needed health care to some Medicaid-eligible Alaskans, but denies it to others, based on criteria entirely unrelated to the Medicaid program's purpose of granting uniform and high quality medical care to all needy persons of this state.[53] Thus, even if 7 AAC 43.140 did not affect constitutional privacy rights and we applied our most deferential standard of review, the regulation still could not withstand equal protection challenge. Under Alaska's rational basis standard,[54] differential treatment of similarly situated people is permissible only if the distinction between the persons "rest[s] upon some ground of difference having a fair and substantial relation to the object of the legislation."[55] DHSS provides necessary medical care to all Medicaid-eligible Alaskans except women who medically require abortions. This differential treatment lacks a fair and substantial relation to the object of the Medicaid program, and therefore violates equal protection.[56]

**49.** 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), *partly rev'd on other grounds, Edelman v. Jordan*, 415 U.S. 651, 670–71, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

**50.** *See id.* at 621, 89 S.Ct. 1322.

**51.** *Id.* at 627, 89 S.Ct. 1322.

**52.** *Id.* at 631, 89 S.Ct. 1322 (internal quotations omitted) (alteration in original) (quoting *United States v. Jackson*, 390 U.S. 570, 581, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968)). This precedent was not discussed in the U.S. Supreme Court's later decision, in *Harris v. McRae,* that the Hyde Amendment was permissible under the federal constitution. 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980). But in *Valley Hospital*, we explained that Alaska's broader constitutional protection at times mandates parting ways with federal precedent. *See* 948 P.2d at 969. In that case, we rejected the plurality opinion of *Planned Parenthood v. Casey*, 505 U.S. 833, 877–78, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), in order to declare that a woman's right to an abortion is fundamental. *See Valley Hosp.*, 948 P.2d at 969. We now join the majority of state courts in concluding that the federal Supreme Court's de-

cision in *McRae* provides inadequate protection under our state constitution.

**53.** In the "Purpose" section of the Medicaid statute, the legislature "declare[s] as a matter of public concern that the needy persons of this state receive uniform and high quality medical care, regardless of race, age, national origin, or economic standing." AS 47.07.010.

**54.** *See Sonneman v. Knight*, 790 P.2d 702, 705 (Alaska 1990) (using term "rational basis" to describe lowest standard of review under Alaska's sliding scale).

**55.** *Isakson v. Rickey*, 550 P.2d 359, 362 (Alaska 1976) (quoting *State v. Wylie*, 516 P.2d 142, 145 (Alaska 1973)). *Isakson* establishes that Alaska's rational basis review is more rigorous than that of the United States Supreme Court. *Id.*

**56.** We note that the United States Supreme Court reached the opposite conclusion regarding the analogous federal regulation in *Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980). However, as noted above, federal rational basis review is a less rigorous standard

The United States Supreme Court reached a similar conclusion in *Shapiro:* although the Court invalidated. states' differential treatment of similarly situated welfare recipients under strict scrutiny, it also noted that the differentiation would be deemed "irrational and unconstitutional" even under federal rational basis review.[57] In *United States Department of Agriculture v. Moreno,* the United States Supreme Court invalidated a similar restriction under rational basis scrutiny alone.[58] The Court found no rational basis for a statute denying food stamps to unrelated persons who shared a household; it therefore concluded that the statute violated equal protection.[59]

Lower court decisions have applied this principle to states' allocation of health care benefits, and concluded that "classification [among recipients] must be based upon some difference between the classes which is pertinent to the purpose for which the legislation is designed." [60] A California court found that the state violated equal protection by paying for attendant services by spouses of elderly and blind aid recipients, but denying payment for the same services by the spouses of otherwise disabled aid recipients.[61] And New York's highest court held that equal protection was violated by a statute that "effectively provide[d] . . . that the aged, disabled, and blind are entitled to less public assistance than other needy persons." [62]

DHSS's differential treatment of Medicaid-eligible Alaskans violates equal protection under rational basis review as surely as it does under strict scrutiny. Under any standard of review, "the State may not jeopardize the health and privacy of poor women by excluding medically necessary abortions from a system providing all other medically necessary care for the indigent." [63]

Because 7 AAC 43.140 infringes on a constitutionally protected interest, the State bears a high burden to justify the regulation.[64] Unless the State asserts a compelling state interest, the statute will necessarily fail constitutional scrutiny.[65] The State has failed to demonstrate such an interest in this case. It primarily defends 7 AAC 43.140 on

than Alaska's rational basis review. *See Isakson,* 550 P.2d at 362. We have explained that Alaska's broader constitutional protection at times mandates parting ways with federal precedent. *See Valley Hospital,* 948 P.2d at 969. The United States Supreme Court in *Harris v. McRae* did not consider the discriminatory allocation of government benefits cases, *Shapiro v. Thompson,* 394 U.S. 618, 634, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) and *United States Department of Agriculture v. Moreno,* 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973), discussed in this opinion.

**57.** *Shapiro,* 394 U.S. at 638, 89 S.Ct. 1322.

**58.** 413 U.S. at 538, 93 S.Ct. 2821.

**59.** *See id.* The Court noted legislative history indicating congressional intent to exclude "so[-]called 'hippies' and 'hippie communes'" from the food stamp program. *Id.* at 534, 93 S.Ct. 2821. But it concluded:

The challenged classification clearly cannot be sustained by reference to this congressional purpose. For if the constitutional conception of "equal protection of the laws" means anything, it must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot constitute a legitimate government interest. As a result, [a] purpose to discriminate against hippies cannot, in and of itself and without reference to [some independent] considerations in the public interest, justify the [challenged] amendment.

*Id.* at 534–35, 93 S.Ct. 2821 (internal quotations omitted, third alteration added).

**60.** *Vincent v. State,* 22 Cal.App.3d 566, 572, 99 Cal.Rptr. 410 (Cal.App.1971).

**61.** *See id.*

**62.** *Lee v. Smith,* 43 N.Y.2d 453, 402 N.Y.S.2d 351, 352, 373 N.E.2d 247, 248 (1977); *see also White v. Beal,* 555 F.2d 1146, 1149–50 (3d Cir. 1977) (finding equal protection issue sufficient to support jurisdiction, but not deciding on equal protection grounds, where remedial eye-care was available only if a person's visual impairment resulted from eye disease or pathology); *County of Orange v. Ivansco,* 67 Cal.App.4th 328, 337–38, 78 Cal.Rptr.2d 886 (1998) (finding equal protection violation where parents supporting noncustodial children received different benefits depending on the children's eligibility for AFDC); *but see Moreno v. Draper,* 70 Cal.App.4th 886, 888–89, 83 Cal.Rptr.2d 82 (1999) (analyzing same regulation as in *County of Orange* and finding no equal protection violation).

**63.** *Right to Choose v. Byrne,* 91 N.J. 287, 450 A.2d 925, 937 (1982).

**64.** *See Matanuska–Susitna Borough School Dist. v. State,* 931 P.2d 391, 396–97 (Alaska 1997) (outlining State's burden for justifying regulations); *Valley Hosp. Ass'n v. Mat–Su Coalition for Choice,* 948 P.2d 963, 971 (Alaska 1997) ("Since the right is fundamental, it cannot be interfered with unless the interference is justified by a compelling state interest.").

**65.** *See Matanuska–Susitna Borough Sch. Dist.,* 931 P.2d at 396–97.

the grounds that "medical and public welfare interests ... are served by the legislature's decision to fund childbirth." But the regulation does not relate to funding for childbirth, and the State's decision to fund prenatal care and other pregnancy-related services has not been challenged. Indeed, a woman who carries her pregnancy to term and a woman who terminates her pregnancy exercise the same fundamental right to reproductive choice. Alaska's equal protection clause does not permit governmental discrimination against either woman; both must be granted access to state health care under the same terms as any similarly situated person. The State's undisputed interest in providing health care to women who carry pregnancies to term has no effect on the State's interest in providing medical care to Medicaid-eligible women who, for health reasons, require abortions.

The State also asserts an interest in minimizing health risks to mother and child, and submits that these interests are often closely aligned. But those interests are not aligned in precisely the situation contemplated by 7 AAC 43.140's Medicaid exclusion: when pregnancy threatens a woman's health. Under the U.S. Supreme Court's analysis in *Roe v. Wade*, the State's interest in the life and health of the mother is paramount at every stage of pregnancy.[66] And in Alaska, "[t]he scope of the fundamental right to an abortion ... is similar to that expressed in *Roe v. Wade*."[67] Thus, although the State has a legitimate interest in protecting a fetus, at no point does that interest outweigh the State's interest in the life and health of the pregnant woman.[68]

Because the State has not asserted an interest sufficiently compelling to justify denying medically necessary care to women who need abortions, we need not consider the means-ends fit of the challenged regulation. We conclude that 7 AAC 43.140 violates equal protection under the Alaska Constitution.

B. *The Separation of Powers Doctrine Cannot Shield Unconstitutional Legislation.*

■ The State argues that by holding the Medicaid program to constitutional standards, the superior court effected an appropriation of funds in violation of the separation of powers between branches of government. We disagree. Under Alaska's constitutional structure of government, "the judicial branch ... has the constitutionally mandated duty to ensure compliance with the provisions of the Alaska Constitution, including compliance by the legislature."[69] The superior court had not only the power but the duty to strike the challenged restriction and any underlying legislation if it found them to violate constitutional rights; the same duty mandates our decision today.

■ The separation of powers doctrine and its complementary doctrine of checks and balances are implicit in the Alaska Constitution.[70] In light of the separation

---

**66.** 410 U.S. 113, 163–64, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

**67.** *Valley Hospital*, 948 P.2d at 969.

**68.** *Accord Byrne*, 450 A.2d at 935 (holding, based on *Roe*, that "at no point in pregnancy may [the state's interest in protection of potential life] outweigh the superior interest in the life and health of the mother").

**69.** *Malone v. Meekins*, 650 P.2d 351, 356 (Alaska 1982); *see also Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is.").

**70.** *See State v. Dupere*, 709 P.2d 493, 496 (Alaska 1985), *modified*, 721 P.2d 638 (Alaska 1986) ("The separation of powers doctrine must be considered along with the complementary doctrine of checks and balances."); *Alaska State-Operated Sch. Sys. v. Mueller*, 536 P.2d 99, 103

(Alaska 1975); *Public Defender Agency v. Superior Court*, 534 P.2d 947, 950 (Alaska 1975).

The United States Supreme Court recently discussed the division of powers within the federal system of government. *See United States v. Morrison*, 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000). It reiterated the duty of courts to limit acts of legislation when those acts conflict with rights guaranteed by the Constitution, explaining that the framers of the Constitution divided power among the three branches of government

so that the Constitution's provisions would not be defined solely by the political branches nor the scope of legislative power limited only by public opinion and the legislature's self-restraint. It is thus a permanent and indispensable feature of our constitutional system that the ... judiciary is supreme in the exposition of the law of the Constitution.

*Id.* at 1753 n. 7, 120 S.Ct. 1740 (internal quotations and citations omitted).

of powers doctrine, we have declined to intervene in political questions, which are uniquely within the province of the legislature.[71] But under the same doctrine, we "cannot defer to the legislature when infringement of a constitutional right results from legislative action"; legislative intent is not paramount when that intent conflicts with the constitution.[72] And the mere fact that the legislature's appropriations power underlies Medicaid funding cannot insulate the program from constitutional review. As the California Supreme Court observed in rejecting nearly identical restrictions on abortion funding, the State's claim would remove all constitutional restraints from legislative exercise of the spending power:

> There is no greater power than the power of the purse. If the government can use it to nullify constitutional rights, by conditioning benefits only upon the sacrifice of such rights, the Bill of Rights could eventually become a yellowing scrap of paper.[73]

Legislative exercise of the appropriations power has not in the past, and may not now, bar courts from upholding citizens' constitutional rights. Indeed, constitutional legal rulings commonly affect state programs and funding. Many of the most heralded constitutional decisions of the past century have, as a practical matter, effectively required state expenditures. In *Green v. County School Board*, the United States Supreme Court ordered effective desegregation of public schools;[74] in *Gideon v. Wainwright*, it required funding of counsel for indigent criminal defendants;[75] and in *Shapiro v. Thompson*, it required states to give newcomers to the jurisdiction equal welfare benefits.[76] In each of these cases, a judicial decision upholding constitutional rights required state expenditures to support those rights. As appellee doctors and Planned Parenthood point out, the funding implications and separation of powers issue in this case would be identical if the State relied on other suspect criteria, such as race, to deny Medicaid benefits. Following the State's argument, the exclusion of one ethnic group—or inclusion only of other specified groups—within legislative Medicaid appropriations would be immunized from constitutional review, merely because the legislature had exercised its spending power. We emphatically reject such a claim. Like the Supreme Court decisions listed above, today's holding is squarely within the authority of the court, not in spite of, but *because* of, the judiciary's role within our divided system of government.

Our conclusion that the separation of powers doctrine supports today's decision is firmly supported by twenty-one other courts that have considered a state's exclusion of medically necessary abortions from state-funded health care programs.[77] The State has not identified a single state or federal case holding that the separation of powers precludes a court from ordering the state to provide equal funding for women whose health is endangered by pregnancy.[78] Courts that have explicitly considered separation of powers challenges to holdings like the one we reach today have dismissed the challenges in no uncertain terms. The Massachusetts Supreme Judicial Court, for example, wrote:

> [W]e have never embraced the proposition that merely because a legislative action involves an exercise of the appropriations power, it is on that account immunized against judicial review. [We reject] the

**71.** *See Abood v. League of Women Voters*, 743 P.2d 333, 338 (Alaska 1987); *Malone*, 650 P.2d at 356–57.

**72.** *Valley Hosp. Ass'n v. Mat–Su Coalition for Choice*, 948 P.2d 963, 972 (Alaska 1997).

**73.** *Committee to Defend Reprod. Rights v. Myers*, 29 Cal.3d 252, 172 Cal.Rptr. 866, 625 P.2d 779 (1981).

**74.** 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).

**75.** 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).

**76.** 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), *partly rev'd on other grounds, Edelman v. Jordan*, 415 U.S. 651, 670–71, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

**77.** *See supra* note 2.

**78.** A single justice in a concurring opinion stated that the judiciary may not, under the equal protection clause of Michigan's constitution, require legislative funding for medically necessary abortion. *Doe v. Department of Soc. Servs.*, 439 Mich. 650, 487 N.W.2d 166, 182–83 (1992) (Levin, J., concurring). To our knowledge, his is the sole dissenting voice on this issue.

argument that either the doctrine of separation of powers or the political question doctrine requires that result. Without in any way attempting to invade the rightful province of the Legislature to conduct its own business, we have a duty, certainly since *Marbury v. Madison,* to adjudicate a claim that a law and the actions undertaken pursuant to that law conflict with the requirements of the Constitution. "This," in the words of Mr. Chief Justice Marshall, "is of the very essence of judicial duty."[79] We agree with this articulation of the court's fundamental powers and duties.

A federal case, *State of Georgia v. Heckler,* also directly supports our conclusion.[80] In that case, the state of Georgia sought reimbursement from the federal Department of Health and Human Services (HHS) for money spent by the state to fund medically necessary abortions. Although the Court of Appeals for the Eleventh Circuit ultimately denied Georgia's claim, it emphatically rejected HHS's argument that because Congress had not appropriated money for medically necessary abortions, a district court could not compel HSS to pay the claims.[81] As the Eleventh Circuit court noted, the statute could preclude payment only if an interpreting court so determined.[82] "There is no doubt," the *Heckler* court concluded, "that if this Court decided that these payments were legally required, HHS would be authorized to make them."[83]

We agree with the Eleventh Circuit: It is legally indisputable that a trial court order requiring state compliance with constitutional standards does not violate the separation of powers doctrine.

## V. CONCLUSION

The manner in which the State allocates public benefits is subject to constitutional limitation under Alaska's equal protection provision. The State, having undertaken to provide health care for poor Alaskans, must adhere to neutral criteria in distributing that care. It may not deny medically necessary services to eligible individuals based on criteria unrelated to the purposes of the public health care program. Moreover, the DHSS regulation in this case discriminatorily burdens the exercise of a constitutional right. Because we conclude that denial of Medicaid assistance to poor women who medically require abortions violates equal protection, we AFFIRM the decision of the superior court.

**L.C.H., Appellant,**

v.

**T.S., Appellee.**

**No. S–9387.**

Supreme Court of Alaska.

Aug. 17, 2001.

---

**79.** *Moe v. Secretary of Admin. & Fin.,* 382 Mass. 629, 417 N.E.2d 387, 395 (1981) (internal citations omitted); *see also Committee to Defend Reprod. Rights v. Cory,* 132 Cal.App.3d 852, 183 Cal.Rptr. 475, 478 (1982) ("When there is an unconstitutional restriction in an existing appropriation, it offends no constitutional principle to direct that the disputed payments be made from funds already appropriated for the same general purpose."); *Clinic for Women, Inc. v. Humphreys,* No. 49D12–9908–MI–1137, Slip Op. at 12 (Ind.Super., Oct. 18, 2000) ("If the challenged enactments violate the state Constitution, the Court can grant relief even if doing so means that state funds will be spent in a manner not explicitly approved by the Legislature. The Court has the power to shape appropriate remedies and the Legislature has a duty to appropriate funds to meet its constitutional obligations."); *Low–Income Women v. Bost,* 38

S.W.3d 689, 702 (Tex.App.2000) ("The relief sought by Low–Income Women—funding medically necessary abortions—cannot be characterized as a new appropriation. They do not ask for a new appropriation of funds to the Medical Assistance Program. Rather, they seek declaratory and injunctive relief against unconstitutional restrictions placed on the use of funds already appropriated pursuant to a pre-existing law authorizing funds to be used for health care under the program.").

**80.** 768 F.2d 1293 (11th Cir.1985).

**81.** *See id.* at 1295–96.

**82.** *See id.* at 1296.

**83.** *Id.*