STOWERS, Chief Justice, dissenting.
The doctrine of constitutional avoidance "is a tool for choosing between competing plausible interpretations of a statutory text." Under this tool, "as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, [our] plain duty is to adopt that which will save the Act. "[1 ]
In State, Department of Health & Social Services v. Planned Parenthood of Alaska, Inc. ( Planned Parenthood 2001 ), this court ruled that the State must provide Medicaid funding for medically necessary abortions.[2] The court did not define the term "medically necessary."[3]
Planned Parenthood 2001 addressed a challenge to a state regulation that limited Medicaid funding for abortions. The regulation mirrored federal criteria for funding of abortions - the so-called "Hyde Amendment" - which provides that federal funds may not be used to pay for an abortion unless the pregnancy threatens the woman's *1006 life or is the result of rape or incest.[4] The superior court held that the State's regulation violated the Alaska Constitution's right to privacy.[5] On appeal, this court affirmed on a different basis, ruling that the regulation violated the Alaska Constitution's equal protection clause because it denied funding for medically necessary care for low-income Alaskans.[6] But the court limited its holding to the requirement that the State fund medically necessary abortions, stating that the case did "not concern State payment for elective abortions."[7]
After this court's decision, the State adopted the definition for "medically necessary" abortions that the superior court had incorporated into its injunction. The superior court defined "medically necessary" abortions as "those abortions certified by a physician as necessary to prevent the death or disability of the woman, or to ameliorate a condition harmful to the woman's physical or psychological health." This was to be "determined by the treating physician performing the abortion services in his or her professional judgment."
Eventually state officials attempted to create a standard that would effectively distinguish between elective and medically necessary abortions.[8] In 2013 the Department of Health and Social Services (DHSS) adopted a regulation defining when an abortion is "medically necessary" for purposes of Medicaid coverage.[9] Planned Parenthood brought suit, arguing that the regulation violated Alaska's equal protection guarantee by singling out abortion among Medicaid-funded services under a restrictive definition of medical necessity. The superior court agreed with Planned Parenthood and granted a preliminary injunction against the regulation.
In 2014 the Alaska Legislature passed a law creating a slightly different definition of medical necessity.[10] The resulting statute, AS 47.07.068, provides that Medicaid will not pay for abortion services unless they are for a medically necessary abortion or the pregnancy is the result of rape or incest.[11] The statute defines when an abortion is medically necessary:
"medically necessary abortion" means that, in a physician's objective and reasonable professional judgment after considering medically relevant factors, an abortion must be performed to avoid a threat of serious risk to the life or physical health of a woman from continuation of the woman's pregnancy.[12 ]
The statute further defines "serious risk to the life or physical health" to include, but not be limited to, "a serious risk to the pregnant woman of (A) death; or (B) impairment of a major bodily function because of" any one of 21 enumerated medical conditions, with a catch-all provision:
another physical disorder, physical injury, or physical illness, including a life-endangering physical condition caused by or arising from the pregnancy that places the woman in danger of death or major bodily impairment if an abortion is not performed.[13 ]
Planned Parenthood amended its complaint to include the statute, and the superior court extended its preliminary injunction to enjoin the statute. After trial the superior court struck down both AS 47.07.068 and 7 AAC 160.900(d)(30) on equal protection *1007 grounds, finding that the enactments impermissibly discriminated against indigent women seeking abortions. The court found that the legislature intended AS 47.07.068 to delineate "a high-risk, high-hazard standard that would preclude funding for most Medicaid abortions." The court concluded that the statute's definition of "medically necessary" covered "only abortions required to avoid health detriments attributable to the enumerated conditions, either fully realizable or demonstrably imminent." The court determined that the statute and regulation, so construed , violated Alaska's equal protection clause, and the court permanently enjoined their enforcement.
The State appeals, arguing that the statute and regulation can - and should - be interpreted to avoid finding them unconstitutional. The State argues, among other things, that the statute is entitled to a presumption of constitutionality: a "well-established rule of statutory construction" requires courts "if possible [to] construe statutes so as to avoid the danger of unconstitutionality."[14] It argues "[n]ot only are statutes presumed constitutional, but any doubts are resolved in favor of constitutionality."[15] This rule, the State asserts, "is based on the recognition 'that the legislature, like the courts, is pledged to support the state and federal constitutions and that the courts therefore, should presume that the legislature sought to act within constitutional limits,' "[16] and "also recognizes that '[d]ue respect for the legislative branch of government requires that [the court] exercise [its] duty to declare a statute unconstitutional only when squarely faced with the need to do so.' "[17]
This court affirms the superior court's decision, holding that the language of the enactments "compels a 'high-risk, high-hazard' interpretation akin to that adopted by the superior court ... [that] imposes different requirements for Medicaid funding eligibility upon women who choose to have abortions than it does upon women who choose to carry their pregnancies to term."[18]
I disagree with the court's interpretative choice. The language of the statute and regulation does not "compel" anything: the language is what it is. It is the court that chooses to construe the language in a manner that leads to the conclusion that the enactments are unconstitutional. Where the court goes astray, in my opinion, is its failure to give anything other than lip-service to a well-recognized canon of statutory interpretation: the doctrine of constitutional avoidance. In Estate of Kim ex rel. Alexander v. Coxe , we explained that
[t]he doctrine of constitutional avoidance "is a tool for choosing between competing plausible interpretations of a statutory text." Under this tool, "as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, [our] plain duty is to adopt that which will save the Act."[19 ]
The court's opinion expressly acknowledges that if an ambiguous statute or regulation "is susceptible to more than one reasonable interpretation, of which only one is constitutional, the doctrine of constitutional avoidance directs us to adopt the interpretation that saves the statute" or regulation.[20] But the court fails to make any real effort to construe the challenged provisions to avoid finding the statute and regulation unconstitutional. To the contrary, in reading the main opinion it becomes evident the court goes to great lengths in construing the statute *1008 and regulation to ensure that the conclusion of unconstitutionality is inevitable.
The State offers an alternative interpretation that would "save" the enactments. Under AS 47.07.068, the State will fund an abortion when a physician determines that a woman's condition indicates that continuing her pregnancy could put her at serious risk of physical impairment. The State argues AS 47.07.068 employs a broad and inclusive definition of when an abortion is medically necessary for purposes of Medicaid coverage. The court acknowledges the State's arguments in support of "saving" the statute. For example, the court explains:
The statute's list of conditions in subsection (b)(4) includes a final catch-all provision that reads, "another physical disorder, physical injury, or physical illness, including a life-endangering physical condition caused by or arising from the pregnancy that places the woman in danger of death or major bodily impairment if an abortion is not performed." The State argues that this catch-all provision broadens the permissive scope of the statute. Because the phrase "another physical disorder, physical injury, or physical illness" contains no severity requirement, this portion of the provision could, by itself, be interpreted to broaden the scope of the covered conditions. Indeed, a State medical expert testified that he saw this provision as "a barn door" that provides "a large opening" for doctors to receive payment for abortions.[21 ]
I would accept the State's argument and, applying the doctrine of constitutional avoidance, construe the statute just so, interpreting the statute, and particularly its catch-all provision, to broaden the scope of covered conditions and thereby avoid the constitutional impediment.[22]
The challenged regulation, 7 AAC 160.900(d)(30), is virtually identical to AS 47.07.068, except in its broader provision for mental health conditions. The regulation authorizes Medicaid coverage to "avoid a threat of serious risk to the physical health of the woman" due to "a psychiatric disorder that places the woman in imminent danger of medical impairment of a major bodily function if an abortion is not performed." The regulation thus covers not only psychiatric disorders that threaten a woman's life, like depression with suicidal ideation, but also psychiatric disorders that threaten the woman's physical health, such as anorexia or self-neglect caused by depression or other mental illnesses, if the physician believes an abortion is needed to avoid these harms.[23]
*1009 To conclude, I believe that AS 47.07.068 and AAC 160.990(d)(30) can and should be interpreted broadly as the State argues to obviate the constitutional infirmities that this court's rigid construction finds. I believe that the legislature can constitutionally determine as a matter of state policy what is "medically necessary" for purposes of expenditure of limited state dollars to fund Medicaid abortions. I believe the court today fails to give respect to the legislature's proper role but instead substitutes its judgment for that of the legislature. Finally, nothing in Alaska's equal protection clause requires the State to subsidize non-medically-necessary abortions for Medicaid-eligible women simply because it provides them with medically necessary healthcare. I respectfully dissent.

Estate of Kim ex rel. Alexander v. Coxe , 295 P.3d 380, 388 (Alaska 2013) (emphasis added) (first quoting Clark v. Martinez , 543 U.S. 371, 381-82, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005) ; then quoting Rust v. Sullivan , 500 U.S. 173, 190, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) ).

28 P.3d 904 (Alaska 2001).

Id.

Id. at 907 n.8.

Id. at 907.

Id. at 913.

Id. at 905.

Minutes, Sen. Fin. Comm. Hearing on S.B. 49, 28th Leg., 1st Sess. (March 29, 2013), http://www.akleg.gov/pdf/28/M/SFIN2013-03-290908.PDF.

7 Alaska Administrative Code (AAC) 160.900(d)(30)(2015).

Act of July 16, 2014, ch. 8, § 2, 2014 Alaska Sess. Laws 1 (codified at AS § 47.07.068 ).

AS 47.07.068(a). The provision for pregnancies resulting from rape or incest mirrors the federal Hyde Amendment. See 42 U.S.C. § 1397ee(c)(1) (2012).

AS 47.07.068(b).

AS 47.07.068(b)(4).

State, Dep't of Revenue v. Andrade , 23 P.3d 58, 71 (Alaska 2001).

See Alaskans for a Common Language, Inc. v. Kritz , 170 P.3d 183, 192 (Alaska 2007).

See State v. Rice , 626 P.2d 104, 108 (Alaska 1981) (citing Kimoktoak v. State, 584 P.2d 25, 31 (Alaska 1978) ).

See State v. ACLU of Alaska , 204 P.3d 364, 373 (Alaska 2009).

Op. at 988-89 (emphasis added).

295 P.3d 380, 388 (Alaska 2013) (footnotes omitted) (first quoting Clark v. Martinez , 543 U.S. 371, 381-82, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005) ; then quoting Rust v. Sullivan , 500 U.S. 173, 190, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) ).

Op. at 992 and n.40 (quoting Estate of Kim , 295 P.3d at 388 ). The court acknowledges that "the statute's text is ambiguous." Op. at 993.

Op. at 992-93 (emphasis added) (footnotes omitted).

This is what the sponsor of the bill intended. I give one example. The court states that "[t]he statute also does not cover abortions when the fetus suffers from a fatal anomaly.... The text does not leave room to consider an abortion medically necessary based on the suffering of the fetus. The bill's sponsor indicated that he believed fatal fetal abnormalities would be covered under the bill's catch-all provision." Op. at 998 (citing letter from Senator John Coghill to Senate Finance Committee Members (Apr. 1, 2013), http://www.akleg.gov/basis/Bill/Detail/28?Root=SB% 20% 2049#tab5_4). "But," the court continues, "this statement, unsupported by other evidence from the legislative history, is not sufficient to overcome the plain meaning of the statute." Op. at 998. Under the doctrine of constitutional avoidance and as a matter of respect for the legislature, I would accept this clear and significant item of legislative history - it is the statement of intent and understanding by the bill's sponsor , after all - as a sufficient basis to broadly interpret the catch-all provision as the bill's sponsor understood and intended it.

Medicaid generally does not cover treatment sought solely to alleviate distress caused by life's circumstances, short of actual diagnosed mental disorders. Medicaid is limited to providing care that protects basic health and does not provide all care that would optimize physical or mental well-being. See 7 AAC 105.110(1) (services not eligible for Medicaid coverage if "not reasonably necessary for the diagnosis and treatment of an illness or injury, or for the correction of an organic system"). A mental health condition is grounds for coverage only if it poses a risk to the woman's life or physical health. The evidence at trial showed that no published studies indicate that abortion is effective as treatment for mental disorders triggered or exacerbated by pregnancy, nor that it is endorsed as such by professional medical societies. Planned Parenthood's own witnesses appear to agree. Dr. Bibeault, a perinatal psychiatrist, was not aware of any studies that identify abortion as a treatment for perinatal mental illness. Dr. Meltzer-Brody, also a perinatal psychiatrist, was not aware of any such studies either, nor had she discussed abortion as a treatment in her own published work on perinatal depression. Dr. Meltzer-Brody also conceded that the medical profession does not view abortion as an approach to treating mental disorders: "I don't think abortion is ever discussed as a treatment in the same way we consider medication treatment or psychotherapies.... I think that's because the medical profession sees ending a pregnancy as a very serious decision, but I don't think it's bandied about as considered treatment."